ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2024-Jan-11 15:35:57
60CV-24-354
C06D16 : 52 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## _____ DIVISION

|  |  |
|---|---|
| JOSEPH SELF and MALINDA SELF, on behalf of themselves and all others similarly situated, | JURY DEMAND |
| Plaintiffs, |  |
| v. | Case No. _____ |
| CADENCE BANK, |  |
| Defendant. |  |

## CLASS ACTION COMPLAINT

Plaintiffs, Joseph and Malinda Self, individually and on behalf of the class of persons preliminarily defined below (the "Class"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a civil action seeking monetary damages, restitution, and injunctive and declaratory relief from Cadence Bank ("Defendant"), arising from its improper assessment and collection of $36 overdraft fees ("OD Fees") on debit card transactions that were authorized on sufficient funds.

2.      Besides being deceptive, this practice breaches the plain language of Defendant's adhesion contract, attached hereto as Exhibit A.

3.      Plaintiffs and other Defendant customers have been injured by Defendant's practice. Plaintiffs, individually and on behalf of the class of individuals preliminarily defined below, bring claims for breach of contract, including the duty of good faith and fair dealing, unjust

enrichment, and violations of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Arkansas Code Annotated ("ACA") § 4-88-101, *et seq.*

## PARTIES

4.      Plaintiffs Joseph and Malinda Self are natural persons and citizens of Arkansas. Plaintiffs reside in Monroe County and have had a checking account with Defendant at all times material hereto.

5.      Defendant is a bank with more than $4.5 billion in assets with and maintains several branches in Arkansas, including in this County. Its principal place of business is in Tupelo, Mississippi.

## JURISDICTION AND VENUE

6.      Defendant regularly and systematically conducts business and provides retail banking services in this state and provides retail banking services to customers in this state, including Plaintiffs and members of the putative Class. As such, it is subject to the jurisdiction of this Court.

7.      Venue is likewise proper in this county pursuant to A.C.A. § 16-58-125 because Defendant maintains multiple branch offices in this county.

## BACKGROUND FACTS

8.      OD Fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees, 84 percent of which were paid by customers who carried an average balance of less than $250. *Why Poverty Persists in America*, N.Y. Times (Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

2

9.      Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Another Bank Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

10.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

11.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

12.     Plaintiffs bring this action challenging Defendant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

13.     Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant held the required funds.

14.     However, Defendant still assesses crippling OD Fees on many of these transactions and misrepresents its practices in the Contract.

15.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

16.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

17.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

18.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

4

19.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

20.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

21.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly

reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

22. But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

23. Besides being deceptive, this practice breaches contract promises made in Defendant's adhesion contracts, which fundamentally misconstrues and misleads consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

24. Federal regulators have repeatedly condemned OD Fees on APSN Transactions where, like here, the financial institution's contract does not expressly and unambiguously permit them.

25. For example, the Consumer Financial Protection Bureau ("CFPB") ordered Regions Bank to pay $141 million to reimburse consumers for OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, In the Matter of: Regions Bank, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

26. In October 2022, the CFPB again declared that the assessment of OD Fees on debit card transactions authorized on sufficient funds may constitute an "unfair act or practice" because consumers cannot reasonably avoid these "unanticipated" OD Fees. *See Circular 2022-06, Unanticipated Overdraft Fee Practices*, Cons. Fin. Protection Bureau (Oct. 26, 2022), https://bit.ly/3VJm3uB.

27.     In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

28.     And in its Winter 2023 Supervisory Highlights, the CFPB again stated this APSN practice is "unfair," as "[c]onsumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures." *Supervisory Highlights Junk Fees Special Edition*, CONS. FIN. PROTECTION BUREAU 4 (Winter 2023), https://tinyurl.com/3ste5dfr. The CFPB explained that "[w]hile work is ongoing, at this early stage Supervision has already identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers" and indicated the CFPB intends to continue pursuing such "legal violations surrounding APSN overdraft fees both generally and in the context of specific public enforcement actions[, which] will result in hundreds of millions of dollars of redress to consumers." *Id.*

29.     The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those

7

transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

30.     On April 26, 2023, the Office of the Comptroller of the Currency ("OCC") joined the chorus of regulators, issuing a bulletin to banks addressing the risks associated with overdraft protection programs. The OCC addressed APSN practices as follows:

> Some banks assess overdraft fees on debit card transactions that authorize when a customer's available balance is positive but that later post to the account when the available balance is negative.
>
> In this scenario, a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles. This is commonly referred to as an APSN transaction. In addition to assessing an overdraft fee on the APSN transaction, some banks also assess an overdraft fee on intervening transactions that exceed the customer's available balance. In this scenario, for example, the bank reduces a customer's available balance by an amount that is more than, equal to, or less than the initial authorized debit card transaction, and subsequently, an intervening transaction further reduces the customer's available balance so that the account no longer has a sufficient available balance. The bank charges an overdraft fee on both the intervening transaction and the initial APSN transaction when posted to the customer's account.
>
> The OCC has reviewed a number of overdraft protection programs that assess overdraft fees on APSN transactions. In some instances, the OCC has found account materials to be deceptive, for purposes of Section 5, with respect to the banks' overdraft fee practices. In these instances, misleading disclosures contributed to findings that the APSN practice was also unfair for purposes of Section 5. In addition, and based on subsequent analysis, even when disclosures described the circumstances under which consumers may incur overdraft fees, the OCC has found that overdraft fees charged for APSN transactions are unfair for purposes of Section 5 because consumers were still unlikely to be able to reasonably avoid injury and the facts met the other factors for establishing unfairness.

*OCC Bulletin 2023-12: Overdraft Protection Programs: Risk Management Practices*, OFFICE OF COMPTROLLER OF THE CURRENCY (Apr. 26, 2023), https://tinyurl.com/mt63pfnb (footnotes omitted).

### A. Mechanics of a Debit Card Transaction

31.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

32.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

33.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account in a process called "settlement."

34.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

35.     There is no change—no impact whatsoever—to the available funds in an account when settlement occurs.

### B. Defendant's Contract

9

36.     The Contract's most basic definition of an "overdraft" states: "[a]n 'overdraft' occurs when a check, ACH, ATM, debit card, bank fee (including any overdraft-related fee), or any other item or other debit (collectively, a 'Transaction') is presented for payment against an Account and the available balance of the Account is insufficient to pay the Transaction." Ex. A at 18.

37.     The Contract further encourages consumers to avoid overdrafts by "not initiat[ing] or conduct[ing] transactions that will overdraw your Account." *Id.*

38.     The Contract further provides that overdrafts are paid or honored when Defendant exercises its discretion to either pay or return a transaction:

> If a Transaction is presented to the Bank and the Bank refuses to honor the Transaction because there are insufficient funds to pay the Transaction, your Account will be assessed a fee as set forth in the current fee schedule . . .
>
> . . .
>
> When an overdraft occurs, . . . the Bank may, at its sole and absolute discretion, refuse the Transaction, or alternatively, the Bank may choose to pay the Transaction, in which case a negative Account balance will result.
>
> . . .
>
> We may return any transaction being presented at any time if your available balance is insufficient to pay such transaction being presented, even if we previously have permitted overdrafts.

*Id.*

> The Bank may, however, at its option honor an NSF item or amount or dishonor such NSF item or amount and avoid creation of an overdraft.

*Id.* at 11.

39.     Authorization is the only point at which Defendant has discretion to decline payment or "return" a debit card transaction. Once a debit card transaction is authorized, Defendant is required to transfer the funds to the merchant at settlement. The above language linking

overdrafts to Defendant's discretion to pay or return the transaction thus means overdrafts occur

at authorization.

40.    The Contract also explains that overdrafts are determined based on the account's

available balance:

> Any Account owner or authorized signer may withdraw all or part of the available
> balance in the Account regardless of who deposited the funds into the Account

*Id.* at 10.

> An "overdraft" occurs when a check, ACH, ATM, debit card, bank fee (including
> any overdraft-related fee), or any other item or other debit (collectively, a
> "Transaction") is presented for payment against an Account and the ***available
> balance*** of the Account is insufficient to pay the Transaction.
>
> . . .
>
> You agree that if your ***available balance*** is insufficient to pay any item presented
> against your Account you will promptly pay both our service charge for handling
> and processing that item and the amount of any overdraft without further notice or
> demand.
>
> . . .
>
> We may return any transaction being presented at any time if your ***available
> balance*** is insufficient to pay such transaction being presented, even if we
> previously have permitted overdrafts.

*Id.* at 18 (emphasis added).

41.    The Contract also promises that Defendant will place authorization holds that

reduce the account's available balance and render the held funds unavailable for other transactions:

> ***Temporary Debit Authorization Hold.*** On debit card purchases, merchants may
> request a temporary hold on your Account for a specified sum of money . . ., during
> which time the amount of funds in your Account available for other transactions
> may be reduced by the amount of the temporary hold.

*Id.* at 10 (emphasis original).

11

42.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses OD Fees on them anyway.

43.     The above contractual provisions indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

44.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

45.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

46.     The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

47.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

48.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiffs to incur more OD Fees than they should.

49.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

50.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

51.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

52.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

53.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

54.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

55.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

56.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

57.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders,

13

other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

58.     Defendant and its accountholders make no such agreement. Instead, the Contract misleads and deceives accountholders regarding the manner in which Defendant will assess OD Fees.

### C. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

59.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

60.     Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

61.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

62.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

63.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

64.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

65.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

66.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

67.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

68.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiffs "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

69.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not

incur an overdraft fee, even if the transaction later settles against a negative available balance."

*Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

70.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

71.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

72.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its customers agree to its practices.

### D.  Plaintiffs Were Assessed an OD Fee on Debit Card Transactions Previously Authorized on Sufficient Funds

73.     Plaintiffs were charged OD Fees on APSN Transactions on numerous occasions.

74.     For example, on August 16, 2023, Plaintiffs were assessed a $36 OD Fee on a debit card transaction that was previously authorized on sufficient funds.

75.     Because Defendant previously placed a hold on the funds required to cover this transaction, Plaintiffs' account always had sufficient funds to pay the transaction and should not have been assessed a fee.

76.     The improper fees charged by Defendant were also not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

77.     Plaintiffs therefore had no duty to report the fees as errors because they were not errors, but were part of the systematic and intentional assessment of fees according to Defendant standard practices.

78.     Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## CLASS ALLEGATIONS

79.     Plaintiffs bring this action individually and as a class action on behalf of the following proposed Class:

> All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled in the same amount for which the debit card transaction was authorized.

80.     Plaintiffs reserve the right to modify or amend the definition of the Class as this litigation proceeds.

81.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

82.     The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

83.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

84.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all members of the Class, were charged improper fees as set forth herein. And Plaintiffs, like all members of the Class, have been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members

18

of the Class and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Class. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Class.

85.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual members of the Class.

86.     Among the questions of law and fact common to the Class include:

    a.  Whether Defendant charged OD Fees on APSN Transactions;

    b.  Whether this fee practice breached the Contract and Defendant's duty of good faith and fair dealing;

    c.  Whether Defendant was unjustly enriched by this practice;

    d.  Whether Defendant violated the ADTPA;

    e.  The proper method or methods by which to measure damages; and

    f.  The declaratory and injunctive relief to which the Class are entitled.

87.     Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

89.     Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

90.     Plaintiffs suffer a substantial risk of repeated injury in the future. Plaintiffs, like all Class members, are at risk of additional improper fees. Plaintiffs and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to violate its Contract and commit its illegal actions.

91.     Plaintiffs' class claims are appropriate to proceed under the ADTPA. Act 986 of 2017—which purports to prohibit most private class actions under the ADTPA—is an unconstitutional intrusion into the Arkansas Supreme Court's exclusive authority to "prescribe the rules of pleading, practice and procedure for all courts." Ark. Const. Amend. 80, § 3; *see also Johnson v. Rockwell Automation,* 2009 Ark. 241, 308 S. W.3d 135; *Broussard v. St. Edward Mercy Health Sys.,* 2012 Ark. 14, 386 S.W.3d 385; *Edwards v. Thomas,* 2021 Ark. 140, 2021 Ark. LEXIS 144 (2021); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); *Mounce v. CHSPSC, LLC,* No. 5:15-CV-05197, 2017 U.S. Dist. LEXIS 160673, at *2 (W.D. Ark. Sep. 29, 2017). Therefore, Plaintiffs additionally seek declaratory relief finding the ADTPA's class action ban unconstitutional.

92.     All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including Breach of the Duty of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and the Class)**

93.     Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

94.     Plaintiffs and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Ex. A.

95.     All contracts entered by Plaintiffs and the Class are identical or substantively identical because Defendant's form contracts were used uniformly.

96.     Defendant has breached the express terms of its own agreements as described herein.

97.     Arkansas imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

98.     Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiffs and other customers—by charging OD Fees on APSN Transactions. This is an abuse of the power that Defendant has over Plaintiffs and their bank account, is contrary to Plaintiffs' reasonable expectations under the Contract, and breaches Defendant's implied covenant to engage in fair dealing and to act in good faith.

99.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply

21

with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

100.    Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

101.    Defendant harms Plaintiffs and members of the Class by abusing its contractual discretion that no reasonable customer would anticipate.

102.    Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

103.    Plaintiffs and members of the Class have sustained damages because of Defendant's breach of the Contract.

104.    Plaintiffs and members of the Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

105.    Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

106.    Plaintiffs and members of the Class conferred a benefit on Defendant at the expense of Plaintiffs and members of the Class when they paid improper OD Fees.

107.    There was an appreciation of this benefit by Defendant in the form of the substantial revenue that Defendant generates from the imposition of such fees.

108.    Defendant has inequitably accepted such improper fees without payment to Plaintiffs and members of the Class for their value.

22

109.   Defendant should not be allowed to profit or enrich itself inequitably at the expense of Plaintiffs and the Class and should be required to make restitution to Plaintiffs and the Class.

### THIRD CLAIM FOR RELIEF
**Violation of the Arkansas Consumer Protection Act (A.C.A. § 4-88-107(a)(10))**
**(On Behalf of Plaintiffs and the Class)**

110.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

111.   The ADTPA is designed to protect consumers from deceptive, unfair, and unconscionable trade practices. The ADTPA is a remedial statute which is to be construed liberally in favor of consumers.

112.   Defendant's wrongful actions as described throughout this Complaint violate the ADTPA, specifically A.C.A. § 4-88-107(a)(10).

113.   As detailed herein, Defendant has violated (and continues to violate) A.C.A. § 4-88-107(a)(10) by deceptively assessing and collecting OD Fees on debit card transactions that did not cause an overdraft in violation of Defendant's fee disclosures.

114.   Plaintiffs and the Class relied on Defendant's misleading and deceptive fee representations.

115.   As a result, Plaintiffs and members of the Class have suffered actual financial loss proximately caused by Defendant's unlawful conduct. Plaintiffs and other members of the Class suffered actual financial loss proximately caused by their reliance on Defendant's unlawful conduct.

116.   Accordingly, Plaintiffs and Class are entitled to recover their damages, attorneys' fee, and costs pursuant to A.C.A. § 4-88-113.

117.    Plaintiffs and members of the Class are also entitled to punitive damages. Defendant knew or should have known that its conduct would result in injury to Plaintiffs and members of the Class, yet it continues such conduct in reckless disregard for the consequences.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Class demand a jury trial on all claims so triable and judgment as follows:

a.      Certification for this matter to proceed as a class action;

b.      Declaratory relief finding the ADTPA's class action ban unconstitutional;

c.      Declaratory and injunctive relief to the extent Defendant's fee practice breaches the Contract;

d.      Designation of Plaintiffs as the Class Representative and designation of the undersigned as Class Counsel;

e.      Restitution of all improper fees paid to Defendant by Plaintiffs and the Class because of the wrongs alleged herein in an amount to be determined at trial;

f.      Actual damages in amount according to proof;

g.      Pre- and post-judgment interest at the maximum rate permitted by applicable law;

h.      Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

i.      Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs, by counsel, demand trial by jury.

Dated: January 11, 2024

By: */s/ Randall K. Pulliam*
Randall K. Pulliam (AR Bar #98105)
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
rpulliam@cbplaw.com

*Attorneys for Plaintiffs and the Putative Class*

# EXHIBIT A

Cadence Bank
Cadencebank.com
(888) 797-7711
Terms & Conditions of Your Account

NOTICE OF SETTLEMENT CONFERENCE, MEDIATION, ARBITRATION, WAIVER OF JURY TRIAL, AND WAIVER OF CLASS ACTION: THIS AGREEMENT CONTAINS PROVISIONS FOR SETTLEMENT CONFERENCE, MEDIATION, ARBITRATION, WAIVER OF JURY TRIAL, AND WAIVER OF CLASS ACTION (SEE SECTION 2 BELOW). BY OPENING YOUR ACCOUNT OR OTHERWISE CONTINUING TO USE YOUR ACCOUNT FOLLOWING RECEIPT OF THESE TERMS AND CONDITIONS, YOU AGREE TO SUCH TERMS. FOR CLAIMS SUBJECT TO BINDING ARBITRATION, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO PURSUE SUCH CLAIMS IN COURT OR HAVE A JURY DECIDE SUCH CLAIMS. ADDITIONALLY, YOU WILL NOT HAVE THE RIGHT TO BRING OR OTHERWISE PARTICIPATE IN ANY CLASS ACTION OR SIMILAR PROCEEDING EITHER IN COURT OR IN ARBITRATION.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | *Agreement; General* | 2 |
| 2 | *Alternative Dispute Resolution (ADR) Provisions* | 3 |
| 3 | *Amendments and Termination* | 4 |
| 4 | *Liability; Conflicting Demands and Suspicious Transactions* | 5 |
| 5 | *Deposits* | 6 |
| 6 | *Withdrawals* | 10 |
| 7 | *Customer Identification; Beneficial Ownership* | 12 |
| 8 | *Ownership of Account and Beneficiary Designation* | 12 |
| 9 | *Business, Organization, and Association Accounts; Authorized Representatives* | 13 |
| 10 | *Fiduciary Accounts* | 13 |
| 11 | *Authorized Signer* | 14 |
| 12 | *Power of Attorney* | 14 |
| 13 | *Death or Incompetence* | 15 |
| 14 | *Notices* | 15 |
| 15 | *Statements; Duty to Review and Promptly Report* | 16 |
| 16 | *Assignment* | 17 |
| 17 | *Setoff; Security Interest; Subordination of POD Beneficiary Interest* | 18 |
| 18 | *Overdrafts and Insufficient Funds; Payment Order of Transactions Being Presented* | 18 |
| 19 | *Signatures on Items; Facsimile Signatures* | 19 |
| 20 | *Indorsements* | 19 |
| 21 | *Abandoned, Inactive, or Dormant Accounts; Escheatment* | 20 |
| 22 | *Transaction Instructions; Restrictions; Breaches of Your Security* | 20 |
| 23 | *Stop Payments* | 20 |
| 24 | *Lost, Destroyed, or Stolen Certified, Cashier's, Official, or Teller's Checks* | 21 |
| 25 | *Backup Withholding/Taxpayer Identification Number and Certification* | 21 |
| 26 | *Verification; Notice of Negative Information; Notification Requirement of Any Possible Inaccurate Credit Reporting* | 21 |
| 27 | *Changing Account Products* | 22 |
| 28 | *Legal Actions Affecting Your Account* | 22 |
| 29 | *Duty of Care* | 22 |
| 30 | *Check Storage and Copies* | 22 |
| 31 | *Check Cashing* | 22 |
| 32 | *Truncation, Substitute Checks, and Other Check Images* | 23 |
| 33 | *Security* | 23 |
| 34 | *Remotely Created Checks Deposited with the Bank* | 23 |
| 35 | *Monitoring and Recording Telephone Calls; Consent to Receive Electronic Communications* | 23 |
| 36 | *Subaccount Organization* | 24 |
| 37 | *Unlawful, Illegal, or High-Risk Transactions* | 24 |
| 38 | *Indemnification* | 24 |

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2 3998-N20230125Y

502

12/2020
Page 1 of 85

| | | |
|---|---|---|
| 39 | *LIMITATION OF LIABILITY AND WAIVER OF RIGHT TO PROCEED AGAINST US FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES* | 25 |
| 40 | *Collection Costs* | 25 |
| 41 | *ACH Transactions; International ACH Transactions* | 25 |
| 42 | *Wire and Other Funds Transfers* | 25 |
| 43 | *Force Majeure* | 26 |
| 44 | *Governing Law* | 26 |
| 45 | *Service Charges; Other Charges* | 26 |
| 46 | *Comparative Negligence Under the UCC* | 26 |
| 47 | *Employer's Responsibility for Fraudulent Indorsements or Transactions by Employees* | 26 |
| 48 | *Severability* | 26 |

## <u>WELCOME TO Cadence Bank!</u>

Cadence Bank greatly appreciates your business. We look forward to doing business with you whether it is your first Account (defined below) with us or if you already have Accounts, loans, certificates of deposit, insurance, a mortgage or other financial products with us. This document is our contract for your Account and it states the terms and conditions that will govern our dealings pertaining to the Account. Please read it carefully and make sure you understand the terms before you use the Account.

Again, thank you for your business and we look forward to taking care of your banking needs.

**1. Agreement; General.** These terms and conditions of your Account, any Account agreement, signature card, or other acknowledgments or documents you sign, and any disclosure statements we provide you concerning fees related to your Account or related services, and any disclosure statements or other agreements we have concerning services related to your Account constitutes your Account agreement (the Agreement). To the extent any disclosure statements or other agreements we have concerning services related to your Account conflict with these terms and conditions, the provisions in these terms and conditions will control, except that disclosure statements and agreements with specific terms relating to specific products and services will control those specific products and services. Despite the foregoing, the provisions of these terms and conditions regarding alternative dispute resolution, settlement conference, mediation, arbitration, waiver of jury trial, and waiver of class action shall control over any conflicting language in any disclosure statement or other agreement we have concerning your Account or your relationship with the Bank. This Agreement defines your relationship with the Bank and your responsibilities concerning your Account. This Agreement covers any and all deposit Accounts (other than certificates of deposit) you have or ever had with us from time to time and by whatever name or description, including, but not limited to, checking, money market, and savings (each, an Account and collectively, the Accounts). By opening your Account, signing the Account opening documentation, conducting any transactions involving your Account or by maintaining your Account after this Agreement is made available to you, you agree to the terms of this Agreement. This Agreement also includes any new or amended provisions and disclosures we may provide concerning your Account.

Read this Agreement and all other applicable documents governing your Account and save them for future reference. You can also obtain additional copies of this Agreement or any subsequent version at any branch location, at the Bank's website at Cadencebank.com or by calling **1-888-797-7711**. A list of the Bank's locations can be found on the Bank's website.

As new types of Accounts are created or as rules or laws change or for various other reasons, this Agreement may be changed from time to time in the future. Certain provisions may be added to or amended or certain provisions in the Agreement may be deleted. We generally try to send you any notice of changes as required under applicable law. The most current version of the Agreement will supersede all prior versions, and you will have been deemed to have accepted and agreed to all of the terms in the new Agreement if you continue to use your Account or keep it open after the effective date of such new version of the Agreement. You agree we can provide subsequent versions of these terms and conditions and other disclosures to you by placing same on our website or by making copies available in our branch lobbies, and you agree that you will be bound by such subsequent versions. It is your duty to review such periodic subsequent versions. This Agreement cannot be changed or modified orally.

Our relationship will be defined by this Agreement, unless otherwise expressly agreed in writing, and the relationship with you will be that of debtor and creditor. No fiduciary, quasi-fiduciary or any other special relationship exists between you and us. Any internal policies or procedures, if any, that we may maintain in excess of reasonable commercial standards and general banking usage are solely for our own benefit and shall not impose a higher standard of care than otherwise would apply in their absence. There are no third-party beneficiaries to this Agreement. Except where prohibited by law, the Bank reserves the right to refuse to open (or to close) an Account for any reason. The Bank also reserves the right to close an Account for any reason at any time except as prohibited by law.

The words "Bank," "we," "our," "us" or "Company," mean Cadence Bank and its subsidiaries and their affiliates together with any bank or other financial services entity that is acquired (in whole or in part) by merger or other acquisition which operates under an existing name until integrated into Cadence Bank. The words "you" or "your" mean the Account holder(s), the Account holder's authorized representatives, and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the Account. If this Account

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3698-N20230125Y

5-62

12/2020
Page 2 of 28

is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

## 2. Alternative Dispute Resolution (ADR) Provisions.

*Settlement Conference to Try to Resolve your Claims against the Company.* While the Company would prefer to resolve all possible disputes between us through its regular customer service channels, there may come a time where you have a dispute with the Company. You agree to try to resolve any possible dispute you have with the Company prior to initiating arbitration or prior to filing any litigation by agreeing to attend an in-person settlement conference, and if that does not resolve the dispute, to non-binding mediation. Such a settlement conference generally contemplates an in-person meeting where both sides try to meet to resolve the applicable issues and exchange documents and information in an effort to try to resolve the dispute. The Company wants to learn the reasons and underlying facts regarding the dispute prior to incurring fees and costs in an arbitration or litigation proceeding. If you do not go to an in-person meeting, you agree you will not seek to recover future attorneys' fees and costs from the Company. Such a meeting contemplates that both parties will act in good faith and negotiations shall remain confidential and all costs and expenses associated with the settlement conference shall be paid by the party incurring such costs or expense.

*Mediation.* If the parties are unable to reach a resolution at a settlement conference, before you file a claim in an arbitration process or before you file a lawsuit, you also agree to make a second effort to try to resolve the dispute by attending a non-binding mediation. Either you or the Company may request a mediation upon written notice to the other party, and the parties agree to work together to schedule a mediation with a neutral mediator within forty-five (45) calendar days of such a request being given. The Company hereby generally agrees that you may select a mediator of your choice, but the mediator must be qualified to serve as a mediator and not be biased. The mediation shall occur in the federal judicial district where we maintain your Account. Both sides will each equally pay one-half (1/2) of the mediation costs to the mediator. Each side will pay for their own attorney's fees, costs, and expenses. If you do not attend this mediation, you agree you will have waived any claim to seek recovery of attorneys' fees and costs from the Company.

*Binding Arbitration.* If a settlement conference or mediation is unsuccessful, you agree that any dispute, claim, or controversy of any kind between you and the Company (whether it arises out of or relates to this Agreement, or to your Account, or any transactions involving your Account, or any service or product related to your Account or the business dealings between us and you) either you or the Company can choose to have that dispute resolved by binding arbitration. This arbitration provision limits your ability to litigate claims in court and waives your right to a jury trial. You should review this section carefully. You will not have the right to participate in a class action lawsuit, either as a class representative or member of any class of claimants for any claim you may believe you have against the Company. Arbitration is a proceeding in which disputes are decided by one or more neutral arbitrators who issue a binding ruling in the form of an award. That award can then become a judgment entered by a court of competent jurisdiction. You and we understand that discovery and other procedures in arbitration may be more limited than discovery in court proceedings and that the ability to modify, vacate, or appeal an award by an arbitrator(s) is strictly limited.

You and we agree, upon written demand made by you or us, to submit to binding arbitration all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether pre-existing, present, or future, that arise out of or relate to: (a) this Agreement, your Account, any transaction involving your Account, any service or product related to your Account, or any advertisements, promotions, representations or oral or written statements related to this Agreement or your Account; (b) the relationships that result from this Agreement (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this arbitration provision); (c) your relationship with us that relates to this Agreement or any other agreement or relationship or dealings that you have with us that is not also subject to a different agreement to arbitrate; (d) the dealings between the parties; or (e) the validity, interpretation, scope or enforceability of this Agreement or the interpretation or scope of the Arbitration Clause (collectively, a "Claim"). All parties retain the right to seek relief in a small claims court for disputes or claims within the jurisdictional limits of the small claims court. At the option of the first to commence arbitration, you or we may choose to have the arbitration conducted by JAMS ADR (JAMS) or the American Arbitration Association (AAA), or you and we may agree upon a different arbitrator. In any event any arbitration under this Agreement shall be conducted in writing in accordance with the AAA Rules (Rules). You agree that this arbitration provision is made pursuant to a transaction involving interstate commerce, and the Federal Arbitration Act (the FAA) shall apply to the construction, interpretation, and enforceability of this Agreement notwithstanding any other choice of law provision contained in this Agreement.

Either you or we may initiate arbitration by giving written notice of the intention to arbitrate to the other party and by filing notice with JAMS or the AAA in accordance with the Rules in effect at the time the notice is filed. The notice shall set forth the subject of the dispute and the relief requested at a minimum. The demand for arbitration may be made before or after commencement of any litigation. You should contact the AAA at 800-778-7879 or www.adr.org or JAMS at 800-352-5267 or www.jamsadr.com for more information about arbitration. If for any reason the AAA or JAMS is unable or unwilling to serve as arbitration administrator, or you and we are unable to agree on another arbitrator, we will substitute another national or regional arbitration organization. Demand for arbitration under this Agreement must be made before the date when any judicial action upon the same Claim would be barred under any applicable statute of limitations; otherwise, the Claim is also barred in arbitration. Any dispute as to whether any statute of limitations, estoppel, waiver,

Sales & Service v3.14                                                          562

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.                                                          12/2020
                            2023091821.1.2.3998-N20230125Y                          Page 3 of 26

laches, or similar other doctrine bars the arbitration of any Claim shall be decided by arbitration in accordance with the provisions of this Agreement.

You cannot join together in a dispute with anyone other than persons who use your Account, although this limitation does not affect the ability of a purely governmental entity to institute any enforcement action. Even if other people have disputes similar to a dispute that you and we have, those people and their disputes cannot be part of any arbitration between you and us. A Claim by, or on behalf of, other persons will not be considered in, joined with, or consolidated with, the arbitration proceedings between you and us, and a Claim may not be arbitrated on a class action, private attorney general, shareholder derivative suit, or other representative basis. Notwithstanding anything to the contrary in this Agreement, any dispute regarding the prohibitions in this paragraph or about the enforceability of the arbitration clause shall be resolved by a court and not by the arbitrator(s). Where the aggregate of all Claims by both you and us does not exceed $250,000, any expedited procedures provided in the Rules ("Expedited Procedures") shall apply and a single arbitrator shall decide the Claims. Where the aggregate of all Claims by both you and us exceeds $250,000, a panel of three (3) arbitrators shall decide all Claims. Each arbitrator, whether or not acting under Expedited Procedures, shall be an active member in good standing of the bar for any state in the continental United States and shall be either: (a) actively engaged in the practice of law for at least 5 years; or (b) a retired judge. You and we agree that the arbitrator(s): (a) shall limit discovery to non-privileged matters directly relevant to the arbitrated Claim; (b) shall grant only relief that is based upon and consistent with substantial evidence and applicable substantive law; (c) shall have authority to grant relief only with respect to Claims asserted by or against you individually; and (d) shall provide a brief written explanation of the basis for the award upon the request of either party, and shall make specific findings of fact and conclusions of law to support any arbitration award that exceeds $25,000.

Upon written request by you, for claims up to $50,000, we will pay to the AAA or JAMS the portion of the arbitration filing fee that exceeds the cost of filing a lawsuit in the federal court where you live. Upon written request by you, we may elect, at our sole discretion, to pay or advance some or all of any remaining arbitration fees and other costs. The arbitrator will decide whether we or you ultimately will be responsible for paying any filing, administrative or other fees in connection with the arbitration. If you are the prevailing party in the arbitration, the arbitrator(s) may order us to pay your reasonable and necessary attorney, expert or witness fees (provided you did not waive this right and provided you attended the initial settlement conference and mediation). Any arbitration proceedings shall be conducted in the federal judicial district where we maintain your Account. If the Company prevails, the arbitrator will order you to pay the Company's reasonable and necessary attorney, expert or witness fees. Judgment upon any award rendered in arbitration may be entered in any court having jurisdiction.

***Waiver of Jury Trial.*** THIS PROVISION LIMITS YOUR RIGHTS TO A JURY TRIAL. YOU SHOULD REVIEW THIS SECTION CAREFULLY. IF: (A) NEITHER YOU NOR WE SEEK TO COMPEL ARBITRATION OF ANY DISPUTE WE HAVE RELATED TO THIS AGREEMENT, YOUR ACCOUNT, OR ANY TRANSACTIONS INVOLVING YOUR ACCOUNT; OR (B) SOME OR ALL OF THE ARBITRATION CLAUSE IS UNENFORCEABLE AND WE ARE IN A DISPUTE IN A COURT OF LAW, THEN EACH OF US AGREES TO WAIVE ANY RIGHT WE MAY HAVE TO A JURY TRIAL TO THE EXTENT ALLOWABLE UNDER THE LAWS OF THE STATE THAT GOVERN THIS AGREEMENT. IN OTHER WORDS, YOU HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS ACCOUNT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY YOU, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE COMPANY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY YOU.

***Class Action Waiver.*** TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU HEREBY AGREE THAT ANY CLAIM, LITIGATION OR ARBITRATION ARISING OUT OF ISSUES RELATING TO YOUR ACCOUNT OR ANY OTHER DISPUTE OR CONTROVERSY BETWEEN YOU AND US REGARDING YOUR ACCOUNT WILL NOT PROCEED AS PART OF A CLASS ACTION AND YOU AND THE COMPANY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO PROCEED IN ANY CLASS ACTION OR SERVE AS A CLASS REPRESENTATIVE.

***Attorneys' Fees and Other Legal Fees.*** In any action between you and us regardless of whether it is proceeding in court or in arbitration, the prevailing party shall recover their attorneys' fees, costs and expenses (provided you did not waive this right and provided you attended the initial settlement conference and mediation).

***Agreed Statute of Limitation.*** Except as otherwise prohibited under applicable law, you agree to bring a Claim against the Company regarding your Account within the lesser of two (2) years of when a potential cause of action accrues or the minimal amount as allowed in your state if your state limits shortening a statute of limitations in a contract. This provision is intended to contractually limit a possible longer statute of limitation that may apply on a claim you may have against the Company.

**3. Amendments and Termination.** We may change any term of this Agreement. Rules governing changes in interest rates are provided in a separate disclosure. For other changes, we agree to provide you notice of any amendment (except an amendment benefitting you) at least thirty (30) calendar days, or a longer period if required by law, before that amendment becomes effective by mailing you notice of the amendment to the last address shown on our records, by delivering the notice electronically if you have agreed to receive such

Sales & Service v3.14    5/02

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

2023091821.1.2.3988-N20230125Y

12/2020
Page 4 of 25

notices electronically, by making the notice available with the periodic statement of your Account (as applicable), by posting notice of the amendment in our offices, or by posting notice of the amendment on Cadencebank.com (or any subsequent official Bank website) or on the Bank's mobile banking platform (if applicable). You agree that it is your responsibility to review the website periodically for any amendments or a subsequent version. We may, but are not required to give you notice if the amendment will be to your benefit. If there is more than one Account owner, we may send the notice of amendment to only one of you. By continuing to maintain your Account, conducting a transaction or obtaining services or products relating to this Agreement or your Account after the amendment becomes effective, you agree to the amendment or subsequent version of this Agreement. No amendment of this Agreement is enforceable against us unless it is signed by the Bank's general counsel. No practice or course of dealing in connection with the Account which is at variance with this Agreement shall constitute a waiver, modification, or amendment of this Agreement.

We may also close this Account at any time upon reasonable notice to you and tender the Account balance personally or by mail. We do not have to give you any notice before we close your Account. Items presented for payment after the Account is closed may be dishonored. When you close your Account, you are responsible for leaving enough money in the Account to cover any outstanding items to be paid from the Account. Reasonable notice depends on the circumstances. In some cases, such as when we cannot verify your identity, we suspect fraud, we receive conflicting instructions from persons authorized to transact on the Account, or when we are otherwise compelled by law it might be reasonable for us to give you notice after your Account is closed or otherwise frozen. Termination of the Account, whether by us or by you, does not relieve you of any obligation you may then owe us. We may accept deposits to the Account after it has been closed in order to collect any deficit balance, and such acceptance will not constitute reinstatement of the Account.

We may (but do not have to) mail you a check for the available balance in your Account, or you may pick up a check for the available balance at our office. Written notice that the Account has been closed and a check, if any, may be sent to any address shown on our records for you, or if the Account is a joint Account, to any Account owner to whom we elect to send it. Once we have closed your Account, you agree that we can:

- refuse to honor any checks you have written or any other items which are presented to us for payment after we have closed your Account;
- refuse to act as your agent to try to collect any check you have deposited in your Account or otherwise, honor or pay any check you have deposited to your closed Account, or to accept any automated deposit to your Account; or
- assess any service charge otherwise applicable against any remaining balance in your Account.

We are not responsible to you for any damages you may suffer as a result of your Account being closed. If you attempt to make a deposit to an account we closed due to non-payment of an overdraft or otherwise, we may collect the deposit and setoff your indebtedness to us and collect a service charge from the amount you deposited. Any funds in excess of $1.00 will be returned to you.

We reserve the right to refuse your request to close your Account, for various reasons, including, for example, if your Account is not in good standing. If you intend to close your Account, you should notify us. Simply reducing your Account balance to $0.00 is insufficient notice and may result in additional fees charged to your Account. If you close your Account, you are responsible for transactions you initiated or authorized, including those that we receive after the Account is closed.

**4. Liability; Conflicting Demands and Suspicious Transactions.** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this Agreement. You authorize us to deduct applicable Account charges as described in any applicable fee schedules or similar document, without notice to you, directly from the Account balance as accrued. You agree to pay any additional charges for services you request which are not covered by this Agreement.

If you have an Account with more than one owner, each owner is jointly and severally liable for all charges and transactions on the Account and any Account shortage resulting from charges or overdrafts, whether caused by you or another with access to this Account. This liability is due immediately, and can be deducted or offset directly from the Account or from Accounts owned or controlled by any common or joint owner. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. You will be liable for our costs as well as for our reasonable attorneys' fees and costs, to the extent permitted by law.

If we are ever uncertain when faced with a possible claim or demand for funds in your Account, or if there is any controversy, dispute or uncertainty regarding the ownership of an Account or its funds, or if there are conflicting demands over its ownership or control, or if there are any conflicting instructions or demands received from those authorized to transact on the Account or who otherwise claim an interest in funds in the Account, or if we are unable to determine any person's authority to give us instructions, or if a third party questions your authority to receive funds you have deposited, or we believe a transaction may be fraudulent or may violate any law, or if we face any other possible controversy, disputes or uncertainty regarding a possible claim to funds in an Account, we may refuse to pay any funds to anyone until we are satisfied that the controversy, dispute or uncertainty is resolved, or we may continue to honor the authority of Account owners and authorized signers as reflected on our records. Under such circumstances, the Bank may decide not to allow any further transactions to be made with regard to an Account to allow it time to try to determine who has rights with regard to the Account and or funds in the Account. If all parties do not agree to a certain course of conduct or resolution or if the Bank believes that the Account may be subject to irregular, unauthorized, fraudulent or illegal activity, the Bank may undertake various possible actions. Specifically, we may, in our sole discretion: (1) freeze the Account and refuse transactions until we receive written proof (in form and

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3996-N20230125Y

562

12/2020
Page 5 of 26

substance satisfactory to us) of each person's right and authority over the Account and its funds and confirmation that no one else is claiming the funds; (2) freeze some or all of the funds in the Account and in other accounts you maintain with us, and delay transactions, until such time as we are able to complete our investigation of the suspected fraudulent, unauthorized, or illegal transactions (3) refuse transactions or return items or funds to the originating source; (4) require the signatures of all Account owners or authorized signers for the withdrawal of funds, the closing of an Account, or any change in the Account regardless of the number of authorized signers on the Account; (5) interplead or pay or offer to pay the Account balance to a court of appropriate jurisdiction, naming all of the claimants to the Account as defendants in an interpleader action (you agree to reimburse us for all expenses we incur in an interpleader action, including attorney's fees and costs, and we may obtain reimbursement of those expenses from any Account you have with us without notice to you); or (6) continue to honor items and other instructions given to us by persons who appear as owners or authorized signers according to our records. If we do freeze or otherwise place a hold on your Account funds or delay transactions, we will provide notice to you as soon as reasonably possible. Notice may be made by mail or verbally or be provided by other means such as via online banking or text alerts as permitted by law or by updated balance information. We may not provide this notice to you prior to freezing the account or delaying transactions if we believe that such notice could result in a security risk to us or to the owner of the funds in the Account. The existence of the rights set forth above shall not impose an obligation on us to assert such rights or to deny a transaction. We will not be responsible for any damages you may suffer as a result of our freezing the Account or our refusal to allow you or anyone else to use or withdraw funds due to the controversy, dispute or uncertainty or our allowing any existing owner or authorized signer to continue to conduct transactions on the Account during the controversy, dispute or uncertainty. You also hereby agree to indemnify the Bank and pay all of Bank's attorneys' fees, costs and expenses it incurs as a result of such a demand or dispute, including attorneys' fees and costs in responding to a subpoena similar request. You agree to cooperate in identifying potential claimants in a dispute. You agree to cooperate in an interpleader proceeding, if necessary. You agree to try to work out possible disputes with other possible claimants. If we are uncertain what to do, we may freeze an Account until we are satisfied that there are no possible future issues and or claims that could arise.

**5. Deposits.** For each amount you are depositing into your Account, you represent to the Bank that you are the proper person to make the deposit and that you have a right to the funds. If your deposit is other than cash or currency, we may, without prior notice to you (except for prior notices required by law), place a hold on the Account for the amount of deposit of items for a certain period of time to allow us to try to verify that the items will be paid. Even after such a hold may be removed, please be aware that the funds being deposited may subsequently be challenged or claimed by a third party. Under the Uniform Commercial Code (UCC), certain deposits can be challenged or returned up to three (3) years later, and you may be responsible for those amounts. Be wary of bank fraud and only deposit checks or cash from people you know.

We may charge for deposits and we may also refuse to accept certain deposits or accept all or part of any deposit for collection or limit the amount of the deposit. We may accept an item for deposit to your Account from anyone without questioning or verifying the authority of the person making the deposit. Items accepted for deposit and drawn on a non-U.S. institution may be subject to a service charge or a longer hold or delay of availability. Any item that we cash or accept for deposit may be subject to later verification and final payment. Even if we obtain a purported final payment under Regulation CC, you could still be compelled to return the funds deposited into your Account under the UCC for up to three (3) years, even if you have already spent or otherwise transferred some or all of the funds. If an item is lost, stolen or destroyed in the collection process, if it is returned to us unpaid, if it is improperly paid, or if it is later challenged, we may deduct from your Account, another Account, setoff from another Account, or otherwise collect from you funds previously credited to your Account, even if you have already used the funds. We may give cash back to any authorized signer or agent in connection with items issued by an owner or payable to any owner, whether or not the items have been indorsed by the owner or payee.

*Cutoff Time.* We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open.

*Provisional Credit of Deposits.* Credit for any item we accept for deposit to your Account, including funds that are deposited by electronic transfer, is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent or if questioned or challenged in the future. If you deposit an item that is subsequently determined to be altered, counterfeit, fraudulent or otherwise questioned, the Bank is allowed to deduct such amount out of your Account in the future even if it was originally paid under Regulation CC. If you deposit a check that is later subsequently dishonored for any reason or questioned for any reason (such as a forgery, forged indorsement, alteration, etc.), the Bank may deduct the amount of the original credit for the deposit out of your Account in the future, without notice to you (even if the check has already been paid). Once you receive a receipt or other verification from us, you cannot later claim that an additional amount was provided to the Bank. Cash deposits are also subject to later verification. If you make a deposit or payment that is not accompanied by instructions indicating how or where it is to be credited, we may apply it at our discretion to any loan or Account any of you maintains with us. We may indorse or collect items deposited to your Account without your indorsement, and we can supply your indorsement, if needed, but may require your personal indorsement prior to accepting an item for deposit or even after accepting it for deposit or negotiation. If you deposit an item that bears the indorsements of more than one person or persons who are not known to us, we may refuse the item, require all indorsers to be present, or require that the indorsement be guaranteed by another financial institution acceptable to us before we accept the item.

*Other Provisions Pertaining to Deposited Items.* Be careful in accepting certain items from unknown persons. If you deposit items that are later returned, you could be responsible for the amounts of the items (even if the funds are purportedly "collected" or "available" and even if you have already spent or transferred the funds). If you get a check or purported cashier's check from an unknown person, be even more cautious if you are agreeing to deposit and then send or transfer funds. All deposits, collections and transactions between

Sales & Service v3.14

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

2023091821.1.2.3996-N20230125Y

562

12/2020
Page 8 of 28

you and the Bank will be governed by the applicable provisions of the UCC, except where modified by this Agreement, Federal Reserve Board requirements, the bylaws and rules of any clearinghouse association to which the Bank (or its correspondent bank handling the item) belongs, and the Bank's funds availability policy. When you make a deposit, please check the deposit slip or other documentation to confirm the amount you think is being deposited. For example, do not leave a Bank branch if you think a possible discrepancy exists. Whenever we accept various deposits and even when we issue receipts, sometimes such deposits and receipts may not match the actual amount deposited. All such deposits and receipts are subject to subsequent verification and correction, if necessary. Even if you have a receipt, if a subsequent question arises about a deposit you made, the Bank can refuse to process the deposit until its questions are resolved. If our calculation of the deposit is different from yours, including amounts of cash deposits, our figure will be considered to be the correct one. If we decide not to process any deposit, we will return it to you personally or by mail or by other reasonable means.

*Collection as Agent*. Items delivered to us for deposit or collection are received by us as your agent for collection and at your risk. We may accept an item for deposit and impose a service charge for attempting collection of the item. In situations where we accept an item for collection only, we will not give you cash or an official check for the items until the items have been paid. We are obligated only to exercise ordinary care in handling and collecting items delivered to us for deposit or collection. If any item deposited to your Account is payable by a payor that is not a bank, we may send the item directly to that payor, items payable through another bank may be sent directly to that bank or to collecting agents who likewise shall have the right to send the items directly to the bank on which they are drawn or at which they are payable. Payment of these items may be accepted in cash or drafts and neither we nor any collecting agents shall be liable for failure to collect such drafts. Each collecting agent is deemed to be your agent. No collecting agent shall be liable for loss arising from any act or omission of another agent. Please understand that we cannot control third parties, and even though we may know of general guidelines as to when actions may be taken on certain deposits, we cannot absolutely know for sure what will happen with deposits. Please do not rely on any purported representations by any of our employees or agents as they may know general guidelines (for example, as to how long deposits generally may take before being finally paid), but since we cannot control third parties, there may be exceptions or other circumstances beyond our control. Furthermore, please be aware that even if a deposit is made and if an employee or agent may represent that funds are "collected," "available" or that an item is "finally paid," this still means that a deposit could possibly be questioned for other reasons for up to three (3) years or possibly longer from the time the deposit was made. Please be wary of different fraud and scams trying to induce people to deposit money, and then send or transfer money. If the deposit is subsequently returned or challenged, you could be responsible for the loss. Even "finally paid" items may be subsequently questioned, challenged or returned. By depositing any funds into your Account, you are representing and warranting that you are the proper person to get the funds. If any deposit is later questioned, challenged or returned by any third party for any reason, you agree to indemnify the Bank and hold the Bank harmless. If the Bank suffers a loss as a result of any deposit you have made, you will immediately repay same upon a request by the Bank. For example, you agree to repay the Bank promptly for any amount credited to your Account in error, and you authorize the Bank to charge your Account or any other Account of which you are an Account owner, to obtain payment of any erroneous payment or credit.

*Check Cashing for Others*. You should not use your Account to cash checks for others who are not well known to you. Although we may make some or all funds provisionally available to you, you are responsible for any loss that occurs if the check is returned to us for any reason (e.g., because it is fraudulent). Our employees cannot promise that checks drawn on or issued by us or other institutions, including cashier's checks, will be paid. Even if a Bank employee may believe a deposited item has been "collected" or says the "funds are good," the Bank could still receive a claim in the future and have to debit the amount of the item out of your Account. Thus, even if you ask an employee for an estimated timeline with regard to when funds may be generally available or when an item may be finally paid under the law, please know that such statements are only rough estimates and we cannot know for certain whether or not such events will eventually occur. Plus, please be advised that even if funds are available and even if an item is "finally paid" under the Regulation CC, people can still try to question deposits for up to three (3) years under the UCC. There may be many situations where you are asked to negotiate a check, and please remember that someone could question your authority to deposit and negotiate the check for up to three (3) years and sometimes longer. There may be other ways to try to verify a collection of an item, but there are additional fees and the process takes longer, but, for example, you could request the item be deposited on a "collection basis," which also means we will not credit funds to your Account until the item is paid.

*Joint Deposits*. If an Account is a joint Account or a payable-on-death (POD) Account (including a "Totten" trust Account) or similar Account, our rights and liabilities for payment of any sums on deposit shall be governed by the laws of the state in which we maintain your Account.

*Deposits by Minors, Agents or Trustees*. A deposit accepted from or on behalf of a minor, at our option, and subject to applicable law, may be paid to or for the benefit of the minor, and the payment shall be valid even though it may not be executed by the minor's guardian, or legal representative. Where a deposit is accepted from an agent, trustee, or other representative we do not have to inquire as to the authority of the representative, and the deposit may be paid to the Account owner or to the representative without inquiring as to the disposition of the deposit.

*Uniform Transfer to Minors Act (UTM) Deposits*. A gift of money to a minor named as beneficiary of a UTM is irrevocable, will be considered made in accordance with the provisions of applicable state statutes governing uniform transfers to minors, and shall include all interest earned on the Account.

Deposit Terms And Conditions
Wolters Kluwer Financial Services. Inc.

Sales & Service v3.14

2023091821.1.2.3998-N20230125Y

562

12/2020
Page 7 of 26

***Check Indorsement Standards.*** If you deposit checks into your Account, you are responsible for the condition of the back of the check when it is deposited. The back of the check is used during the check collection process to record the identification of banks processing the check. Most of the back of the check is reserved for bank use. You agree that the indorsement of the check must be contained in the payee indorsement area, which is limited to 1-1/2 inches from the trailing edge of the check on the back. The trailing edge of the check is defined as the left side of the check looking at it from the front. Any writing, stamp, or marking outside of the payee indorsement area may delay the proper return of any unpaid check you have deposited. You agree to indemnify us from any loss or liability including attorney's fees that may be caused by your failure to adhere to the indorsement standards of the Federal Reserve System.

***Indorsement Issues.*** When you deposit certain checks or items into your Account, you are making certain warranties to the Bank. For example, when you are depositing a check, you are warranting to the Bank that you are not depositing an altered check, that you are the proper person to negotiate the check, all signatures and indorsements are valid and legitimate or that you have the right to obtain the funds represented by the check. We may accept for deposit any item payable to you or your order, even if that item is not indorsed by you. We may give cash back to any one of you. If a check is made payable to two or more people, please be advised that one of those other purported payees may try to later claim that you were not entitled to the funds, and you may need to return the funds to the Bank. You agree to only deposit checks with all indorsements required under the law. You may be asked to list your Account number directly below your indorsement. Again, all checks and items you want to deposit into your Account must be indorsed by all required payees. The Bank may or may not require that any non-customer of the Bank be present in the Bank before accepting such an indorsement, or the Bank may require that any indorsement on the back of the check other than your own be guaranteed by the other indorser's bank. The Bank may take other measures as it deems appropriate under the circumstances. Notwithstanding such issues, anyone can make a deposit to your Account. We understand that you sometimes want other people to deposit amounts into your Account, and we may not question the authority of a person making a deposit to your Account. In certain situations, we may notice that certain deposited checks may not be indorsed by you, and we may decide to accept such checks even if they are not indorsed or even if they are indorsed by any signer of your Account or by your officer, employee or agent or by a stamped or pre-printed indorsement. We may even supply your indorsement, if needed, as allowed under the applicable law. We may also refuse, limit or return deposits in accordance with the circumstances as they exist at the time. Any item deposited to your Account that lacks an indorsement may be supplied with an indorsement, or may be deemed to be indorsed, by the Bank on your behalf. With respect to any such item, the Bank's rights and our liabilities shall be determined as though you actually indorsed and deposited the item. Further, any item deposited to your Account that bears your stamped or facsimile indorsement shall be deemed to bear your actual indorsement whether such indorsement was affixed by you or by someone having no authority to supply your indorsement. If for any reason a deposit is later questioned, you may be responsible for same. For example, if you deposit a check or item, and the check is later returned to us because a claim has been made that an indorsement is missing or that an indorsement is either not complete or not authentic, we may withhold the amount of the check or item from your Account until either the claim is withdrawn or fully resolved or the check is paid. The Bank can undertake such actions even if you have already spent some or all of the funds. If the amount of the funds is no longer in the Account, you will need to promptly repay such amount to the Bank or to the claimant. You agree to assume responsibility and indemnify the Bank for any loss it may incur as a result of any such missing or improper or possibly fraudulent indorsements or as a result of your failure to comply with any of the indorsements standards as set forth herein.

***Errors in Account Identification.*** Please be careful in making deposits to correctly list the proper Account number into which you want the deposit negotiated. The Bank has no duty to detect any inconsistent information provided with the deposit. The Bank will rely on the Account number on any deposit received, even if the deposit identifies a party different from the Account number. You will be responsible for any loss caused by your failure to properly identify the Account to which a deposit is made or intended to be made or any other error made as a result of same.

***Other Deposit Issues Involving Automated Clearing House (ACH) Credits.*** Just like checks or items that are deposited, other types of deposits may also be questioned, revoked or returned. For example, credit for an ACH is provisional until final payment is received by the payee's financial institution. Until that happens, the party originating the transfer is not deemed to have made payment to the beneficiary, and the payee's bank is entitled to a refund of the provisional credit. If we give you provisional credit for an ACH transfer, but do not receive final payment or the credit is otherwise revoked or disputed, you become obligated to us for the full amount without prior notice or demand. We are not required to give you a separate notice of our receipt of an ACH transfer. If we accept ACH credits to your Account, you will receive notice of the credit on your next regular periodic statement. Although we may send notice of a non-ACH incoming funds transfer (e.g., a wire), we assume no obligation to do so. You also can contact us by calling **1-888-797-7711** or by visiting one of the Bank's locations, a list of which can be found at **Cadencebank.com.**

***Foreign Currencies.*** Deposits in foreign currencies will be converted to U.S. dollars at the exchange rate in effect at the time of final collection. You will be responsible for verification of any exchange rate information provided by us in advance of final collection. Exchange rates may fluctuate significantly in a short period of time. You bear all exchange risk related to deposits of foreign currency.

***ATM Depositories, Night Depositories, Direct Deposit, and Deposits by Mail.*** Our ATMs, night depositories, direct deposit service, and deposit by mail service are for your convenience. You agree to comply with our rules in effect from time to time for making deposits in this manner. We may discontinue or suspend these deposit services at any time without notice to you, except where required by applicable law. We are not accountable for deposits made in this manner until the deposit is actually accepted and processed by our authorized employees. If you deliver a deposit to us and you will not be present when the deposit is counted, you must provide us a deposit slip itemizing the deposit. To process the deposit, we will verify and record the deposit, and credit the deposit to the Account. You will be entitled to credit only for the actual deposit as determined by us, regardless of what is stated on the itemized deposit slip. Any initial or

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3096-N20230125Y

562

12/2020
Page 8 of 26

interim credit applied to your Account with respect to a deposit made in this manner is subject to verification by us, and we may adjust such initial or interim credit applied to your Account to reflect the actual amount received by the Bank. Deposits made in this manner will be posted to your Account on the date accepted by our authorized employees. Our records are conclusive proof of what deposits we received from you. You should indorse the check being sent through the mail with the words "For Deposit Only" and should include your correct Account number underneath to ensure the check is credited to the correct Account. You should use the pre-encoded checking deposit slips found behind your checks in your checkbook. If you do not use your deposit slip or provide us with instructions indicating how or where the check should be credited, we may apply it to any Account or any loan balance you have with us or we may return the check to you. If any direct deposit is recalled, we are authorized to reverse the deposit without prior notice to you except as otherwise required by law. Your claim that an item was deposited, which is now missing, will not create a presumption that there is a missing item or that we failed to act with ordinary care. If you make a deposit and if you do not get a receipt or if your receipt for the item does not match the amount deposited, please immediately contact us by calling 1-888-797-7711 or visiting one of the Bank's locations, a list of which can be found at Cadencebank.com.

***De Minimis Discrepancy.*** We have no duty to compare for accuracy the items listed on your deposit slip with the items accompanying the slip when the deposit is received by us, as we rely upon the information that you provide on your deposit slip when we initially process your deposit. When we receive your deposits, we may provisionally credit your Account for the amount declared on the deposit slip, subject to later verification by us. You have a duty to ensure that the amount declared on your deposit slip is correct, even if you did not prepare the deposit slip. You agree that our records are conclusive as to the amount of the deposit we received, without regard to any receipt, deposit slip, or other notice of the deposit amount. If an error in your deposit is later detected, we may make correcting entries (debit or credit) to your Account and notify you of the correction. However, if the error in completing your deposit slip was inadvertent and is less than $1.00 (a de minimis discrepancy), regardless of whether such de minimis discrepancy is in your favor or ours, you agree that we need not adjust your Account. You and we waive any and all claims and demands against each other with respect to any de minimis discrepancy that we elect not to correct.

***Deposit of Government Benefits.*** If you receive credits to your Account through a governmental source and or from another similar entity or on behalf of a governmental entity, and if a reclamation claim is ever filed against your Account, you agree to refund all credits that went into your Account or pay back the Bank for any loss it sustains if there is a reversal of those credits. If we are required for any reason to reimburse any government for all or any portion of a benefit payment that was deposited into your Account whether via a reclamation or other demand/claim, you authorize us to deduct the amount of our liability to the government from the Account or from any other Account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability. Even if the government is incorrect or even if the person that provided the credit is incorrect in trying to reverse or revoke or reclaim same, you agree to handle those issues by and between you and the person or entity that provided the credit and the Bank has your authority to pay back any amounts being demanded by such person or governmental entity. You acknowledge that a reclamation issue is truly an issue by and between you and the governmental entity and you agree to pay the Bank for any loss caused by same.

***Chargebacks.*** This section applies to items that you deposit or cash. In the event a cashed or deposited item is questioned by a third party or if drawn on us (an "on us" item) is determined by us not to be payable for any reason or a cashed or deposited item drawn on any other payor is returned to us for any reason without regard to whether the other payor returned the item to us before a purported deadline to do so, we may charge the item (a "chargeback item") to your Account or to any Account of which you are an owner (including any joint Account) or an authorized signer. We may debit all or part of a chargeback item to your Account even if doing so results in or causes an overdraft of your Account and regardless of whether the item can be physically returned to you. You waive notice of dishonor in connection with any item that is not finally paid in full and that we charge back to your Account. We may recover from you any amount withdrawn by you against a chargeback item. In the event that our debit of all or part of a chargeback item results in or causes an overdraft of your Account, we may obtain and retain possession of the item, if it is available, until we recover from you the amount of any overdraft of your Account and for a reasonable time thereafter. If we are notified that any item for which you received payment or credit to your Account is not properly payable, you agree that, without notice to you, we may authorize the drawee bank to freeze the disputed funds or otherwise hold the item and try to obtain payment. We will not initially decide whether a cashed or deposited item has been improperly returned, and if you believe that a cashed or deposited item has been improperly returned, you should contact us immediately. We will not be responsible for failing to pay any item presented against your Account before a deposit becomes available for withdrawal as set forth above, if the available balance in your Account, without regard to such deposit, is insufficient to pay the item, as provided in this Agreement.

***Service Charges; Error Correction.*** We may debit a service charge from your Account for each deposited item that is returned to us unpaid (whether for the first or a subsequent time); bears an unauthorized signature; prior to deposit has been altered, erased, defaced or mutilated, or is incorrectly described on the deposit slip. Errors in posting, addition, subtraction and calculation, whether by you or us, are subject to correction by us at any time, provided that we may not be obligated to correct certain errors if you fail to notify us of the exceptions in a timely manner as described in this Agreement. You agree to repay us promptly any amount credited to your Account in error, and you authorize us to charge your Account or any other Account of which you are an Account owner, to obtain payment of any erroneous payment or credit.

***Allocation of Deposits/Split Deposits.*** You may request that the total amount of a deposit be allocated in portions and credited to multiple Accounts, which may include a loan. We may, in our sole discretion, decline any split deposit request and require that the deposit be

Sales & Service v3.14

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

2023091821.1.2.3696-N20230125Y

562

12/2020
Page 9 of 26

made into one Account. If a hold is placed on all or any portion of the deposit, the hold may be placed on any one Account to which funds were deposited for the total amount of the hold, notwithstanding the split deposit. In the event a deposited item becomes a chargeback item, we may debit all or part of the chargeback item to any one Account to which funds were deposited even if doing so results in or causes an overdraft on the Account.

**6. Withdrawals.** Any of you, acting alone, who signs to open the Account or has authority to make withdrawals may withdraw or transfer all or any part of the Account balance at any time, and we may pay any check that bears an authorized signature, regardless of any printed legend or multiple signature lines that indicate you require multiple signatures. Each of you authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to your Account or any other transaction with us. Any Account owner or authorized signer may withdraw all or part of the available balance in the Account regardless of who deposited the funds into the Account. We accept no responsibility or obligation, except as required by law, to supervise or review the use of your Account. Please remember that if you withdraw funds that have been credited to you based on a deposit, that credit could subsequently be reversed or charged back causing your Account to be overdrawn.

*Stale and Postdated Checks; General Terms and Checks Bearing Notations; Restrictive Legends; Miscellaneous.* We may in our discretion and without notice to you, either allow the deposit of or pay or return any check that is presented to us for payment more than six (6) months after the date of that check (a "stale-dated" check), even if the presentation occurs after the expiration of a stop-payment order. We normally do not examine the date on checks presented for payment. You agree that we are not required to identify stale-dated checks or to seek your permission to pay them. We may also, in our discretion and without notice to you, either pay or return any check we receive before the date on that check. Each postdated item covered by a note or postdating may be subject to a service charge. We may disregard any information on an item drawn on your Account other than the signature of an Account owner or authorized signer, the amount of the item, the date of the item (subject to the provisions of this Agreement regarding stale and postdated checks), the Account number, the indorsements, and any other information which appears in magnetic ink at the bottom of the check. The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends or other special instructions on every check. Although we are not obligated to, we may allow the deposit of or pay or accept checks and other items bearing restrictions or notations (e.g. "void after 6 months" "two signatures required," "payee's indorsement required," "not valid for more than $(amount)." "void if not paid in (number) days," "payment in full," and the like), whether on the front or back, in any form or format. If you cash or deposit an item or write a check with such a notation, you agree that it applies only between you and the payee or maker. The notation will have no effect on us, and you agree to accept responsibility of the deposit of or the payment of the item. We are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. We shall have the right, but not the obligation, to process any item that is materially incomplete or has been altered.

*Checks and Withdrawal Rules.* We may refuse any withdrawal or transfer request which you attempt by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the Account until your identity is verified. Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your Account or reclassify it as a transaction Account. If we reclassify your Account, your Account will be subject to the fees and earnings rules of the new Account classification. If we are presented with an item drawn against your Account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item. See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those Accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. We may determine the amount of available funds in your Account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the Account balance at the subsequent time will determine whether there are insufficient available funds.

*Temporary Debit Authorization Hold.* On debit card purchases, merchants may request a temporary hold on your Account for a specified sum of money, which may be more than the actual amount of your purchase. This often happens when the merchant does not know the amount of the purchase at the time the card is authorized. Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your Account, will eventually be adjusted to the actual amount of your purchase, but it may be three (3) business days or possibly longer before the adjustment is made, during which time the amount of funds in your Account available for other transactions may be reduced by the amount of the temporary hold.

*Waiver of Multiple Signatures on Electronic Check Conversion, and Similar Transactions.* An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions, the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. In such cases you waive any requirement of multiple signatures. The Bank will not monitor or enforce a purported multiple signature requirement. Although your Account documentation, resolutions or your checks may indicate that more than one signature is required on checks and for the withdrawal or transfer of funds, that notation is principally for your own purpose. We do not assume a duty to enforce multiple signature requirements. As such, we assume no duty to confirm that two or more (or any combination) of authorized users have approved any transaction. We

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3998-N20230125Y

502

12/2020
Page 10 of 26

expressly disclaim a duty to enforce multiple signature requirements. As such, we expressly disclaim a duty to confirm that two or more (or any combination) of authorized users have approved any transaction. We may act upon the instructions or order of any one authorized signer. In other words, any policy you adopt for multiple signatures on checks is for your internal control purposes only and shall not be binding or impose any duty of care on us. You bear the risk that a check bearing any authorized signature will be paid. We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.

*Notice of Withdrawal.* We reserve the right, where required by law or regulation, to require not less than 7 calendar days' notice in writing before each withdrawal from an interest-bearing Account other than a certificate of deposit, or from any other savings Account as defined by Regulation D (the law requires us to reserve this right, but it is not our general policy to use it).

*Cash Withdrawal; Security Issues.* Cash withdrawal or payments at any branch or ATM may be restricted due to the limited amount of currency on hand. If we do not have sufficient cash for a large withdrawal or payment, we may make arrangements for a later cash payment or offer to make payment with a bank check. If you leave the Bank with a large amount of cash after receiving funds from the Bank, you assume the risk of doing so. The Bank cannot control the actions of third parties and is not liable for same, even if you are robbed of those funds on Bank premises. The Bank assumes no responsibility to provide personal protection for customers who elect to carry small or large sums of cash on, off or around our premises, and if you are carrying such cash, please undertake your own security precautions. Withdrawals may not be allowed in certain circumstances. For example, without prior written notice to you we may place a hold on your Account to cover a claim against your Account, or we may pay the source of the claim when we receive any notice, claim or court order which we believe may affect your Account (such as liens, garnishments, attachments, levies, injunctions, or other orders of a court, or other governmental agency), regardless of the form or manner in which we receive the notice, claim, or court order and regardless of whether we are a named party to the notice, claim, or court order. We will not be responsible for refusing to let you withdraw funds from the Account or refusing to pay items presented against your Account while the hold is in effect or after we have paid funds to the source of the claim.

*Withdrawal of All or a Substantial Portion of Funds in an Account; Closing Withdrawal.* If you want to withdraw all of the funds in an Account, as long as the funds are available and collected, we may allow you to do so, even if there are other signers on the Account that are not requesting the funds. Although we are not obligated to do so, we may require suitable identification or presentation of Account ownership records for any large withdrawal or Account closure. We may also require your signatures for the withdrawal of funds or the closing of any Account. At our discretion, we may require all of your signatures for the withdrawal of funds or the closing of any Account.

*Presenting or Cashing of Checks.* We sometimes have non-customers present us with checks drawn on your Account, and we may require such non-customers to present us with suitable identification, a thumb print or other reasonable means to properly identify the person before allowing the cashing of your check at one of our branches. If you do not want someone to have to do this, nothing prevents you from withdrawing funds from your Account and providing cash to the payee. However, please be advised that you need to provide your own security precautions, and that cash withdrawals or payments at a branch may be restricted due to a limited amount of currency on hand. If you are seeking to obtain a large amount of currency, please contact your local branch to make arrangements as we may then try to make arrangements to have a sufficient amount of cash for a large withdrawal payment or we may need to offer to make a payment with a bank check. You can find the contact information for your local branch online at Cadencebank.com or by calling **1-888-797-7711**.

*Overdrafts and Insufficient Funds.* We suggest that you regularly balance your Account to monitor the amount of funds available for your use in the Account. You agree to not overdraw or make disbursements that will overdraw your Account. It is your duty to assure that you have sufficient funds in your Account to cover all checks, debits, holds, or other disbursements that are charged against your Account. Any charge (whether a check or other disbursement), that causes the Account to go into an overdraft situation, or is debited against the Account after the Account is in an overdraft situation, a fee will be assessed as set forth in the Bank's current fee schedule which may change from time to time. The Bank has no duty, and under no circumstances shall be required, to monitor your Account for you. It is your duty and responsibility to routinely monitor and balance your Account. The Bank may assess a special charge for any overdraft of your Account or for any item or withdrawal request drawn against your Account that we return due to insufficient funds (NSF). The Bank may, however, at its option honor an NSF item or amount or dishonor such NSF item or amount and avoid creation of an overdraft. If the Bank pays an item or amount that overdraws your Account, you agree to pay the amount of the overdraft together with any overdraft charge imposed by the Bank (as allowed by law), immediately upon notice of such overdraft, at the Bank's offices, whether the overdraft was caused by you or another person authorized to sign on the Account, regardless of whether you signed or requested the withdrawal or participated in the transaction creating the overdraft or received any benefit from the withdrawal creating the overdraft. Unless applicable law prohibits the collection of such cost, you agree to pay all costs and expenses, including attorneys' fees incurred by the Bank in the collection of any overdraft. Whether the Bank honors or pays any item while your Account is overdrawn or which causes your Account to be overdrawn does not in any manner obligate the Bank to honor or pay any overdraft in the future.

*Third-Party Withdrawals.* Some customers arrange with a third party to have their bills paid automatically. As part of these arrangements, some customers give authority to third parties to issue checks on their Accounts without having the customer sign them (checks without signature). If you have made this type of arrangement, and we pay a check written by this third party, we have no obligation to reimburse you for our payment of any check issued by this third party. We may ask you for a copy of your agreement with this third party, but we have no obligation to require a copy of the agreement as long as it appears to us that you have authorized the debits to your Account.

Sales & Service v3.14

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

2023091821.1.2.3998-N20230125Y

982

12/2020
Page 11 of 28

*Other Account Transactions Such as Wire Transfers, ACH and International ACH Transactions.* This Agreement is subject to Article 4A of the UCC. If we receive a credit to the Account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit. If we receive a credit from a wire transfer or similar type of transaction, if the credit is made through an error, you agree to not use the funds and agree to return the funds to the proper party. If you decide to not implement any reasonable security procedures recommended by the Bank, you assume all risk of loss on future such transactions. You also need to make sure you safeguard your banking information to prevent such losses and or undertake other reasonable security procedures to prevent losses as recommended by the Bank from time to time. Section 4A.201 of the UCC discusses having reasonable security procedures and to the extent that you try to initiate funds transfers, you must keep all of your banking information protected. You also agree to implement any security procedures recommended by the Bank, including any security procedures offered as additional services by the Bank. You hereby agree that the Bank's own internal security procedures have been implemented in good faith and are commercially reasonable. You are agreeing to same by your use of any services to do fund transfers. You also acknowledge that the Bank offered you other products and services and you are making the choice to obtain these products and services or not obtain them, and unless you inform the Bank in writing your desire to obtain these products and services, you agree that although offered, you refused these products and services.

**7. Customer Identification; Beneficial Ownership.** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an Account. What this means for you: when you open an Account, we will ask for your name, address, date of birth (for individuals), and other information that will allow us to identify you. We will also ask to see your government-issued photo identification (for individuals) or other identifying documents. To help the government fight financial crime, federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. If you are a legal entity customer or if you are a representative of a legal entity customer, you will immediately provide us with information and documentation that we request about both your beneficial owners and any other person or entity having any direct or indirect equity interest in you. You agree that you will notify us immediately upon any changes to your beneficial owners or any other person or entity having any direct or indirect equity interest in you. You also agree to update such information upon request or otherwise confirm the accuracy of information previously provided to us. Until such updates are provided, the beneficial owner and other ownership information previously provided shall be deemed complete, accurate and current. As used in this section, the terms "beneficial owner" and "legal entity customer" have the meanings given to them in 31 C.F.R. § 1010.230(d) and (e), respectively, as the same may be amended from time.

*Owners.* You appoint all other Account owners and authorized signers as your authorized agents for all purposes relating to your Account including, but not limited to, indorsing checks, stopping payments, making deposits, making withdrawals, obtaining Account information, making transfers from the Account, closing the Account, or pledging or assigning the Account. A withdrawal from your Account by any Account owner or authorized signer will discharge our obligation to you with respect to the amount withdrawn, regardless of the source or ownership of the funds in the Account. Any Account owner of a multiple party Account may add a new owner or authorized signer to the Account. We may require that you execute new Account documentation before any change in ownership or authorized signers becomes effective. We may, but are not required to, honor a request by you to prevent a withdrawal or transfer by any other Account owner or authorized signer or to remove another Account owner or authorized signer from the Account. A service charge may apply if we honor the request, and you agree to indemnify us and hold us harmless from any loss or damage to you or anyone else that results from our honoring the request. You may be asked to sign additional documents or agreements in connection with the request. Owners of the Account may have people assisting them regarding the Account. To the extent that you share your information with non-owners or allow your Account information to be compromised and obtained by other non-owners, you agree that you will not be able to later claim that an alleged unauthorized person improperly did withdrawals, disbursements or other transactions with regard to your Account. Preventing fraud starts with you as the customer.

**8. Ownership of Account and Beneficiary Designation.** We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the Account funds. Please check with your own attorney, accountant, or estate planner to obtain advice as to what happens to funds in an Account after an Account holder's death. We are not providing any legal advice, tax advice and or any other type of advice on these issues.

*Single-party Account.* Unless modified by the laws of your state, a single-party Account is owned by one person or entity.

*Multiple-party Account.* Unless modified by the laws of your state, a multiple-party Account is owned by two or more persons or entities jointly with right of survivorship and not as tenants in common, regardless of the conjunction (or, and) used between the depositors' names. Each of you expressly agrees that the Account is not owned as a tenancy by the entireties. Each of you intends that upon your death the balance in the Account (subject to our rights of setoff and any previous pledge to which we have consented) will vest in and belong to the survivor(s) as the separate property and estate of such survivor(s). If two or more of you survive, you will own the balance in the Account as joint tenants with survivorship and not as tenants in common. Transactions on multiple-party Accounts do not require the signatures of all Account owners to transact on the Account. Instead, any one Account owner or authorized signer may transact on the Account to the exclusion of the other(s), and each of you authorize each other of you to do so without further consent. If this Agreement is governed by the laws of the state of Louisiana, the owners of a multiple-party Account are co-owners of the Account, and all or any part of any deposit may be paid to any one of you, whether any other of you is living or not, and any such payment to any of you shall constitute receipt and acquittance and shall fully release and discharge us from the claims of any person to funds of the deceased depositor for the payment made.

*Account with Minor as an Owner.* If this is a multiple-party Account and one or more of the Account owners is a minor, all adult owners of the Account jointly and severally agree that all transactions made on the Account by any such minor shall be deemed to have been made by such adult owners, regardless of whether any such transaction may be void or voidable. Each owner hereby agrees to indemnify us and hold us harmless from any loss we incur in connection with any transaction made by any such minor.

*POD Account.* Unless modified by the laws of your state, a POD Account is an Account where one or more persons are listed as the beneficiary(ies) to whom the balance of the Account is to be paid following the death of all Account owners. Subject to the Bank's security interest and right of setoff as herein provided, POD beneficiaries acquire the right to withdraw only if: (a) all Account owners die, (b) the beneficiary is then living, and (c) we are not otherwise required by law to make payment to some other person. If two or more beneficiaries are named and survive the death of all persons creating the Account, the funds on deposit belong to them in equal, undivided shares.

**9. Business, Organization, and Association Accounts; Authorized Representatives.** For all purposes relating to the Account, we may rely on the type of entity, as set forth on the Account documents, for a business, organization, or association Account. You represent and warrant that: (a) all action necessary to open and maintain the Account has been taken by the entity on whose behalf the Account is opened; (b) the entity has the legal right to use the name under which it operates and any fictitious name, if any, under which the entity will conduct business; (c) you have the authority to open and conduct business on the Account on behalf of entity on whose behalf you are acting and that you will at all times only act within the scope of your authority and that all resolutions or other authorizations given to us by you are true, accurate, and complete; and (d) if any of the owners or authorized signers change, you will let us know in writing and provide new appropriate authorization and/or other new appropriate documentation. The entity's authorized representatives are those individuals listed on the Account documents and they have complete authority over the Account including, but not limited to, making deposits, making withdrawals, indorsing checks, closing the Account, stopping payment, overdrawing the Account, and entering into agreements on your behalf for any other products and services we offer that may be used in connection with your Account, and each such authorized representative may take such actions individually and without participation by any other authorized representative. Authorized representative may also include any person who has been authorized to obtain Account information, even if they do not have signing authority on the Account, and any person reasonably believed by us to have the authority to act on the entity's behalf or any person who may have capacity to act on behalf of the entity under the law of agency. We will honor the authorization of an authorized representative until we actually receive written notice of a change from the entity.

**10. Fiduciary Accounts.**

*General.* Generally, a fiduciary is someone who is appointed by court or by contract or otherwise by law to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds, and we have no obligation to supervise or monitor transactions on fiduciary Accounts, including, but not limited to, custodial Accounts, Accounts for estates, conservatorships, guardianships, trusts, and representative payees. A fiduciary Account may be opened and maintained by a person or persons named as a trustee under written trust agreement, or as executors, administrators, guardians or conservators under court orders, or for representative payee capacity. If there is more than one fiduciary, regardless of the terms of the fiduciary relationship, each fiduciary shall be deemed to have independent transaction authority on the Account for purposes of transacting on the Account or otherwise conducting business with the Bank. You understand that by merely opening such an Account, we are not acting in the capacity of a fiduciary or trustee in connection with the fiduciary relationship nor do we undertake any obligation to monitor or enforce the terms of the fiduciary relationship. To the maximum extent permissible under applicable law, we have no responsibility or obligation to supervise or monitor the transactions within fiduciary accounts (including, but not limited to, estate accounts, guardianship accounts and trust accounts), or to inquire as to the powers or duties of the Account owners or signers. In the event of the appointment and qualification of any successor fiduciary the Bank may require such successor fiduciary to deliver to the Bank an affidavit of succession or such other document acceptable to the Bank certifying to the Bank that such person is the duly appointed, qualified, and serving successor fiduciary, and the Bank shall be entitled to rely thereon without further inquiry and shall be fully protected in relying on such. Notwithstanding the lack of any duty of the Bank so to further inquire, the Bank may nevertheless make such further inquiry as to the identity and qualification of a fiduciary or successor fiduciary as it deems appropriate in its sole discretion, and by further inquiring, the Bank shall not be deemed to have assumed any duty. The Bank may additionally require a fiduciary or successor to execute and deliver a certification as to the fiduciary's authority to act in a form acceptable to the Bank. Each fiduciary and successor fiduciary agrees to give prompt notice to the Bank in the event that any fiduciary or successor fiduciary resigns or is removed or if any additional fiduciary is appointed or becomes empowered to act as fiduciary. We have no duty to monitor the Account in any way.

*UTM Accounts.* For Accounts established under a state's UTM laws, the funds in the Account are owned by the minor. The Account may be accessed only by the custodian (or successor custodian), and the funds must be used for the benefit of the child. We, however, have no duty or agreement whatsoever to monitor or ensure that the acts of the custodian (or successor custodian) are for the child's benefit. We are not responsible to monitor age or eligibility for a UTM Account, even though our records may include the minor's date of birth. It is the custodian's responsibility to properly distribute the funds in the Account upon the minor's death or attainment of the age of majority. For this type of Account, the child's Social Security Number or Tax Identification Number is generally used for the Backup Withholding Certification.

*Indemnification by Fiduciaries.* IF THE ACCOUNT IS A FIDUCIARY ACCOUNT (INCLUDING, BUT NOT LIMITED TO, CUSTODIAL ACCOUNTS, AND ACCOUNTS FOR ESTATES, CONSERVATORSHIPS, GUARDIANSHIPS, TRUSTS, AND

REPRESENTATIVE PAYEES), YOU, THE FIDUCIARY, AGREE IN YOUR INDIVIDUAL CAPACITY TO INDEMNIFY US AND HOLD US HARMLESS FROM ANY LOSS, COSTS, DAMAGE, LIABILITY, OR OTHER EXPENSE WE MAY SUFFER OR INCUR ARISING OUT OF OR IN ANY WAY RELATED TO THE ACCOUNT OR ANY CLAIM BY A BENEFICIARY OR OTHER PARTY RELATED TO THE AUTHORITY OR ACTIONS TAKEN BY YOU IN CONNECTION WITH THE ACCOUNT, WHETHER RESULTING FROM OVERDRAFT, ERROR IN YOUR FAVOR, RECLAMATION BY ANY GOVERNMENTAL PAYOR, ANY DISPUTE WITHIN THE SCOPE OF THIS AGREEMENT OR ANY OTHER REASON. IN THE EVENT OF ANY SUCH LOSS, WE MAY ENFORCE THE FOREGOING INDEMNITY BY SETTING OFF THE AMOUNT OF SUCH LOSS AGAINST (OR BY EXERCISING ANY SECURITY INTEREST WE MAY HAVE IN) ANY OTHER ACCOUNT WITH US IN WHICH YOU, THE FIDUCIARY, HAVE AN INTEREST (UNLESS YOUR INTEREST IN SUCH ACCOUNT IS ONLY AS A FIDUCIARY), AND WE WILL NOT BE LIABLE TO YOU OR TO ANYONE ELSE FOR THE DISHONOR OF ANY ITEM OR ORDER ON SUCH OTHER ACCOUNT WHICH RESULTS FROM SUCH SETOFF OR EXERCISE OF OUR SECURITY INTEREST.

**11. Authorized Signer.** Each person whose name is recorded as a signer on the Account documents, including those designated as an authorized signer is appointed as your duly authorized agent to conduct all business with respect to the Account, including, but not limited to, depositing funds to the Account, issuing stop-payment orders, closing the Account and withdrawal and receipt of the balance of funds on deposit in the Account. By appointing an authorized signer, an Account owner does not give up any rights to act on the Account. Each Account owner is liable for any transactions of the other signers on the Account. We undertake no obligation to monitor transactions to determine whether they are on an Account owner's behalf. An owner may terminate the authorization of an authorized signer at any time, and the authorization is automatically terminated by the death of the last living Account owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority of an authorized signer; and (b) we have had a reasonable opportunity to act on that notice or knowledge. Unless prohibited by applicable law, the authority of a person who has no ownership interest in the Account and is designated as an authorized signer on the Account, or similar designation of representative authority, will survive the disability, incompetency, or incapacity of the Account owner, and we may rely on the authority of any such person until we receive actual written notice of the revocation of such person's authority by one authorized to revoke the authority and have reasonable opportunity to act on such notice. Each authorized signer is bound by and subject to the terms of this Agreement. We may refuse to accept the designation of an authorized signer.

**12. Power of Attorney.** Unless required by applicable law, we reserve the right to not accept any power of attorney presented to us. If we accept a power of attorney, we may require evidence of the attorney-in-fact's authority to act under it as well as such affidavits, opinions of counsel, medical opinions or indemnifications we deem appropriate. If we accept a power of attorney in connection with a specific request, we still reserve the right to refuse to accept it for any subsequent request, subject to applicable law. If we accept a power of attorney, we may continue to honor the transactions of an agent under a power of attorney until: (a) we have received written notice or have actual knowledge of the termination of the authority granted under the power of attorney or the death of the principal; and (b) we have had a reasonable opportunity to act on that notice or knowledge. We are not required to monitor the action of your agent under a power of attorney or to determine whether the agent is acting within the scope of the power of attorney. All actions taken by your agent under a power of attorney are binding on you, and you agree not to hold us responsible for any loss or damage any Account owner may incur as a result of our following instructions given by a purported agent acting under any purported power of attorney we reasonably determine is valid. To the fullest extent allowed by law, you agree to indemnify the Bank for any wrongful act or use of a power of attorney by an attorney-in-fact acting on your behalf. Except as required by the applicable law, we may require that a power of attorney be executed on a form acceptable to us, that the power of attorney contain language satisfactory to us or that the attorney-in-fact present the original power of attorney before we honor the orders or instructions of the attorney-in-fact. We may restrict the types and dollar amount of transactions an attorney-in-fact may conduct. We may terminate acceptance of a power of attorney at any time and for any reason and without notice to any Account owner or any other person. If we honor the orders and instructions of the attorney-in-fact, Account transactions conducted by the attorney-in-fact and the instructions and orders of the attorney-in-fact are binding on all Account owners. We assume no duty to monitor the actions of your attorney-in-fact to ensure that (s)he acts for your benefit. We are not required to accept a durable power of attorney if the Bank would not otherwise be required to engage in a transaction with the principal under the same circumstances. This includes a circumstance in which the agent seeks to establish a customer relationship with the Bank under the power of attorney when the principal is not already a customer of the Bank or expand an existing customer relationship with the Bank under the power of attorney or acquire a product or service under the power of attorney that the Bank does not offer. We may also refuse to accept a durable power of attorney if engaging in the transaction with the agent or with the principal under the same circumstances would be inconsistent with another law of the state or a federal statute, rule or regulation, or be inconsistent with a request from a law enforcement agency, or be inconsistent with a policy adopted by the Bank in good faith as necessary to comply with another law of the state or a federal statute, rule, regulation, regulatory directive, guidance, or executive order applicable to the Bank. We are also not required to accept a durable power of attorney if the Bank would not engage in a similar transaction with the agent because the person or an affiliate of the Bank has filed a suspicious activity report with respect to the principal or agent or believes in good faith that the principal or agent has a prior criminal history involving financial crimes, or has had a previous, unsatisfactory business relationship with the agent due to or resulting in a material loss to the Bank, financial mismanagement by the agent, or is engaged in litigation between the Bank and agent or if multiple nuisance lawsuits have been filed by the agent. We may also refuse to accept a power of attorney if we have actual knowledge of the death of the principal or termination of the agent's authority or the power of attorney before the agent's exercise of authority under the power of attorney. We may also refuse to accept a power of attorney if we received information that leads the Bank to believe that the principal lacked the capacity to execute the power of attorney at the time of its execution. We may also refuse to allow use of a power

Sales & Service v3 14                                                                 567

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc

2023091821.1.2.3998-N20230125Y

12/2020
Page 14 of 25

of attorney if the agent refuses to comply with the request for certification, opinion of counsel, or translation, or if the agent complies with one or more of those requests, the Bank in good faith is unable to determine the validity of the power of attorney or the agent's authority to act under the power of attorney because the certification, opinion, or translation is incorrect, incomplete, unclear, limited, qualified, or otherwise deficient in a manner that makes the certification, opinion, or translation ineffective for its intended purpose, as determined in good faith by the Bank. We may also refuse to accept the power of attorney regardless of whether an agent's certification, opinion of counsel, or translation has been requested or received by us if we believe in good faith that the power of attorney is not valid, the agent does not have the authority to act as attempted, or the performance of the requested act would violate the terms of business entities governing documents or an agreement affecting the business entity including how the entity business is conducted.

We may also refuse to accept a power of attorney if a person has commenced, or the Bank has actual knowledge that another person commenced, a judicial proceeding to construe the power of attorney or review the agent's conduct and that proceeding is pending. We may also refuse to accept a power of attorney if we have knowledge that someone has commenced, or has actual knowledge that another person commenced, a judicial proceeding for which a final determination was made that found the power of attorney invalid with respect to a purpose for which the power of attorney is being presented for acceptance, or the agent lacked the authority to act in the same manner in which the agent is attempting to act under the power of attorney. We may also refuse a power of attorney if the Bank has made, or has actual knowledge that another person has made, a report to a law enforcement agency or other federal or state agency stating a good faith belief that the principal may be subject to physical or financial abuse, neglect, exploitation, or abandonment by the agent or a person acting with or on behalf of the agent. We may also refuse to accept a power of attorney if the Bank receives conflicting instructions or communications with regard to a matter from co-agents acting under the same power of attorney or from agents acting under different powers of attorney signed by the same principal or another adult acting for the principal. We may also refuse to accept the durable power of attorney if per the law of the jurisdiction that applies in determining the power of attorney's meaning and effect, or the powers conferred under the durable power of attorney that the agent is attempting to exercise are not included within the scope of activities to which the law of that jurisdiction applies. We may also refuse to accept a springing power of attorney, especially if the Bank cannot determine to its satisfaction whether the contingency triggering the effectiveness of the power of attorney has occurred. We may also refuse to accept a power of attorney if it expires at some point in the future, particularly where the expiration is contingent on an event the occurrence of which the Bank would have no knowledge. If the Bank originally accepts a power of attorney and if facts or circumstances change, the Bank reserves the right to refuse to honor the power of attorney for future requests to conduct business under the power of attorney in the future without incurring liability to you, and the Bank has absolute discretion in making this decision. The Bank also may require additional information or documentation from you or the attorney-in-fact that we deem to be sufficient, again in the Bank's sole and absolute discretion. The Bank may require you or the attorney-in-fact to satisfy any questions or concerns it may have regarding a power of attorney submitted to the Bank.

**13. Death or Incompetence.** You agree to notify us promptly in writing if any person with a right to withdraw funds from your Account(s) dies or is adjudicated incompetent. We will presume you or anyone acting on your behalf or acting on behalf of a co-owner or authorized agent for the Account is competent unless we receive notice of an adjudication of incompetency from a court, even if a Bank employee has personal knowledge of your possible incompetency and even if we receive documentation from a medical doctor. We may continue to honor your checks, items, and instructions until we receive such written notification or until ordered otherwise by a person claiming to have an interest in the Account, the Bank receives evidence satisfactory to it that such order or request is valid, and the Bank has a reasonable opportunity to act on such order or requests. Notwithstanding the foregoing, we may pay checks drawn on or before the date of death or adjudication of incompetence unless stop-payment orders are placed by one with authority to place such order.

**14. Notices.**

*From Bank to You.* Any notice we send you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Alternatively, any notice we send to you is effective, at our option, when we send or otherwise make such notice available to you in accordance with any other method with which you have agreed including, as it relates to amendments of this Agreement, any means or method described herein. Subject to applicable law, you agree that we may also send notices and communications to you electronically, if you provide us with an email address, and you are required to notify us promptly upon any change in your email address. Any notice we send to an email address you provide us is effective, even if it is later returned to us as undeliverable. If your Account is a multiple-party Account, notice to any of you is notice to all of you.

*From You to Bank.* Unless otherwise set forth in this Agreement, notice from you to us must be in writing. Any notice from you to us will not be deemed received by us until it is received by one of our representatives who is authorized to act on such notice. In the event we are required by law or this Agreement to act on any notice you give us, you agree that we will be allowed reasonable time to act on your notice. Notice from any one of you may be considered by us to be notice from all of you. You can find the contact information for your local branch online at **Cadencebank.com** or by calling **1-888-797-7711.** Any written notice you give us is effective when it is received by a representative of the Bank who is authorized by us to consider and act on your notice, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. If we fail to act or otherwise delay in acting on any notice from you, such delay or failure does not constitute our acceptance, or acknowledgement of, or agreement or consent to the terms or substance of your notice.

Sales & Service v3.14                                                                567

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.                                                              12/2020
                                                                                          Page 15 of 26
                              2023081821.1.2.3986-N20230125Y

**15. Statements; Duty to Review and Promptly Report.**

*Periodic Statements.* Periodic statements for your Account will be made available for you at approximately monthly intervals unless we specify to you another interval period when you open your Account or thereafter. The periodic statements will describe each transaction, disbursement and item by item number (where appropriate), amount, and date of debit or credit. For certain types of Accounts, the periodic statement may be accompanied by the items or a facsimile of those items listed on the statement, unless the item or an image of the items is unavailable for any reason, for example, when an item is electronically presented (or re-presented) for payment against your Account. Additionally, the Bank can make your statements available through its online banking platform for qualifying Accounts. You agree that the statement and items all have been made available to you in a reasonable manner. If you do not receive a periodic statement, please contact the Bank promptly and request a duplicate copy. You can contact the Bank by calling **1-888-797-7711** or visiting one of the Bank's locations, a list of which can be found at **Cadencebank.com**. The Bank will not know that you have not received a statement and thus it is up to you to contact the Bank to get a periodic statement if you have not received one. Otherwise, the Bank will presume that you received your statement. We will not be responsible for any actual, direct or indirect, special, or consequential damages under any circumstances for our inability to provide copies of checks. Our liability, if any, will not exceed the face amount of an item or amount in question.

*Mailing and Availability.* Periodic statements and canceled checks, to the extent we have agreed to provide either of them for your Account, and written notices of dishonor or return of unpaid deposited items, or any other notice or communication may be mailed to you at the address shown in our records or a forwarding address for you if one is on file with the U.S. Postal Service. However, we may not mail any Account information to an address that the U.S. Postal Service has informed us is "undeliverable" or otherwise invalid. Periodic statements and written notices of dishonor or return of unpaid deposited items, or any other notice or communication, may be delivered to you electronically if you have agreed to receive such notices and communications electronically. You agree to give us written notice of any change of your address or email address. Notify us promptly if you do not receive your statement or other documents by the date you normally would expect to receive it. We may, but are not required to, change the address for you in our records if the U.S. Postal Service notifies us of a new address for you, and you waive any and all claims against us that arise in connection with any mail forwarded to you or sent to an address for you supplied to us by the U.S. Postal Service. Any Account owner, authorized signer or other person authorized to act on your behalf may change the mailing or email address for your Account. Notice to any one Account owner shall constitute notice to all Account owners in a joint Account. We may make statements, images of canceled checks (if applicable to your Account), notices, or other communications available to you by holding all or any of these items for you or delivering all or any of these items to you, in accordance with your request or instructions. If we hold statements or notices to you at your request or because you fail to provide us with a current address, they will be deemed delivered to you when they are prepared (for held statements), mailed (for returned mail), or when sent or otherwise made available to you by electronic means.

*Your Duty to Timely Report Errors, Unauthorized Transactions, and Forgeries or Any Other Irregularities.* Since you are the person most familiar with your own banking activity, the Bank will be relying on you to review the periodic statements and confirm whether there is possible unauthorized activity. In a situation where alleged unauthorized activity has occurred, the Bank is expecting you to be reviewing your monthly or periodic banking information to try to detect any possible alleged unauthorized activity as early as possible to stop such transactions and to prevent possible new alleged unauthorized activity from occurring. You are the best person to review your current banking records and confirm if transactions are possibly unauthorized. Our records regarding your Accounts will be deemed correct unless you timely establish with us that we made an error. It is essential that any Account errors of any kind, including missing deposits, improper deposits or credits, unauthorized transactions, alterations, unauthorized wire transfers or other unauthorized funds transfers, unauthorized signatures, unauthorized or forged indorsements, forgeries, encoding errors, disbursements due to oral banking transactions, posting errors (such as debits or credits posted twice, debits posted as credits or credits posted as debits), unauthorized or disputed fees (of any kind), or any other improper transactions, debits, credits or disbursements on your Account (collectively referred to as exceptions) be reported to us as soon as reasonably possible and not to exceed thirty (30) calendar days after we send or otherwise make the statement or notice available to you. Otherwise, we will not be liable for the exceptions. You agree that you will carefully examine each Account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) calendar days after we send or otherwise make the statement or notice available to you, you agree that we will not be liable to you for any loss you suffer related to that exception, and that you cannot later dispute the transaction amounts and information contained in the statement. This means that, if you do not report exceptions to us within thirty (30) calendar days after we send or make the statement or notice available to you, we will not reimburse you for any such disputed amounts or any loss you suffer, including, but not limited to, any amounts lost as a result of paying any unauthorized, forged, or altered items, alleged unauthorized wire transfer of funds, or allegedly improperly paying any other debits or credits of any kind, including without limitation, any item or exceptions. Except as provided by applicable law, you also agree that we will not be required to reimburse you for any exceptions caused by your own negligence.

*Online Access.* Where online access to your Account has generally been made available to you, for purposes of your duty to examine your statements and Account activity and report exceptions, irregularities, errors, discrepancies, or unauthorized items, your statements and items will be deemed "made available" to you the day such items, disputed amounts, or transactions first appear on our online banking services, whether you accessed your Account information via online banking or not, but in any event not later than thirty (30) calendar days after your periodic statement is first made available to you as discussed above.

Sales & Service V3.14                                                                 S52

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.                                               12/2020
                                                                                      Page 18 of 20
2023091821.1.2.3998-N20230125Y

***Unauthorized Activity by the Same Wrongdoer(s).*** If you have entrusted someone else to do activity with regard to your Account or if your Account information has been compromised, and if the same wrongdoer(s) begins conducting transactions against your Account, you are prohibited from asserting a claim based on any additional unauthorized activity of any kind, including any and all unauthorized exceptions that are done by the same person, that occurs more than thirty (30) calendar days after the Bank mailed or otherwise made available to you the Account statements that contained a description of that person's first unauthorized, forged or altered item or transaction, error, irregularity, or exception, or any other alleged unauthorized activity that caused the disbursement to be debited from your Account. Since the periodic statements show all disbursements out of your Account, you should be able to detect whether or not you made a disbursement out of your Account by reviewing the Account statement, and if you do not timely report alleged unauthorized disbursements by the same person, you remain free to try to recover any losses from that person, but you are prohibited from recovering such losses against the Bank. Plus, if the same person causes any other unauthorized activity, for example, such as unauthorized deposits, we will not be liable for any future losses (regardless of how made) if you failed to initially discover or report the unauthorized banking activities within thirty (30) calendar days of the first unauthorized transaction, error, irregularity, or exception.

***How to Report Such Possible Exceptions, Errors or Other Irregularities.*** If you find any unauthorized disbursements, transactions or exceptions, or suspect that a transaction may be unauthorized or questionable, you must contact us as soon as possible. You can contact the Bank by calling **1-888-797-7711** or visiting one of the Bank's locations, a list of which can be found at **Cadencebank.com**. You need to specifically report each and every unauthorized disbursement, transaction or exception. A general reference to fraud is not sufficient. You will be asked to execute a verified claim form or an affidavit or a similar document for each disputed disbursement, transaction or exception. To be clear, you must identify each unauthorized disbursement, transaction or exception, instead of merely making a vague reference to some unauthorized disbursement, transaction or exception. You will need to cooperate with the Bank's fraud department or other personnel and you will likely be asked to execute paperwork regarding the unauthorized transactions or exceptions. The Bank must receive your documentation within ten (10) calendar days following your notice to us of the alleged unauthorized activity and if you do not receive such paperwork, please follow up to obtain such documents or create your own documents specifically describing and identifying the unauthorized transactions or exceptions, as you must particularly describe the bank fraud in writing. You agree that you will not bring any legal action against the Bank unless and until you have first provided the documents referenced in this section. When you report missing, stolen, or unauthorized checks, we will likely require you and, if so requested, you agree to close your current Account and open a new one. If you do not do so, we are not liable to you for subsequent losses or damages on the Account due to forgery, fraud or other unauthorized use. When you open a new Account, you may need to notify any third parties that need to know your new Account number. If you believe bank fraud occurred, you may decide to file a police report and ask for the prosecution of the person responsible for same, in which case you agree to provide us with a copy of such report and cooperate with us in any investigation or any legal action instituted against such person. You will indemnify and hold us harmless from any liability arising out of or in any way connected with any arrest or prosecution in the event that the representations of fact you provide us or in a police report are false. You agree to pursue all rights you may have under any insurance coverage you maintain before making a claim against us in connection with any transaction involving your Accounts or your checks or other withdrawal orders and other exceptions and irregularities, and to provide us with all reasonable information about your coverage, including the name of your insurance carrier, policy number, policy limits and applicable deductibles. Our liability is reduced by the amount of all insurance proceeds you receive or are entitled to receive. At our request, you agree to assign to us your rights under your insurance policy.

***Dual Control.*** You agree that to try to prevent possible bank fraud, to the extent possible, you will maintain dual control over monitoring banking activity in reviewing the periodic statements. For example, if the Account has two or more authorized signers or is a non-consumer Account, you agree to have two different people reviewing the information and prior banking transactions to verify the authenticity of same.

***Additional Verification Services.*** The Bank may offer various services to try to assist you in detecting bank fraud such as positive pay or similar services. You are strongly encouraged to use such services. You may or may not elect to obtain such additional services, and if you do not contact the Bank to obtain such services or you otherwise refuse such services, and if such services could have prevented or mitigated some or all losses you sustained or claim to have sustained as a result of actual or possible bank fraud, then you agree that you assume the risk of that decision and you are estopped from seeking and agree not to seek to recover such amounts from the Bank. You may also want to speak with an insurance agent to possibly obtain insurance to cover yourself against a possible future fraud loss.

***Errors Relating to Electronic Fund Transfers or Substitute Checks (For Consumer Accounts Only).*** Notwithstanding the foregoing, for information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**16. Assignment.** Any assignment, assignment of a security interest, pledge, or other transfer of any Account or any interest therein, whether by gift or otherwise, by you to a third party shall be null and void at inception and shall not be binding on us unless it is authorized in writing by an officer of the Bank in the Bank's legal department. Unless we agree otherwise in writing, the Account will remain subject to our rights of setoff even after we receive notice of an assignment, pledge, or transfer to which we did not expressly agree in writing. We are not required to accept or recognize an attempted assignment, pledge, or transfer of your Account or any interest in it, including a notice of security interest, except as required by law. The Bank, in its sole discretion, may freely assign your Account and this Agreement with or without notice.

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3298-N20230125Y

562

12/2020
Page 17 of 26

**17. Setoff; Security Interest; Subordination of POD Beneficiary Interest.** We may (without prior notice and unless prohibited by law) setoff the funds in your Account against any due and payable debt any of you owe us now or that may arise in the future. If you have a multiple-party Account, we may setoff any funds in the Account against a due and payable debt for which any one of you are liable to us now or in the future, to the extent of your liability, including, but not limited to, partnership debts. If your debt arises from a promissory note or guaranty agreement, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note or guaranty, and this amount may include any portion of the balance for which we have properly accelerated the due date, if required.

This right of setoff does not apply to an Account if prohibited by law. For example, the right of setoff does not apply to this Account if:

   a.   it is an Individual Retirement Account or similar tax-deferred retirement account, or

   b.   the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or

   c.   the debtor's right of withdrawal only arises in a representative capacity, or

   d.   setoff is prohibited by the Military Lending Act or its implementing regulations.

We will not be liable for the dishonor of any item when the dishonor occurs because we set off a debt against this Account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff. In addition to the rights of setoff which we have under this Agreement, you hereby grant to us a security interest in the Account or any time deposit account or certificate of deposit owned or controlled by the Account holder (or any Account holder if a multiple-party account) to secure payment of any obligation which you now owe us or which you may owe us at any time in the future, whether as a borrower, guarantor, or otherwise, including your obligation to pay our attorneys' fees and expenses and your obligation to indemnify us as provided elsewhere in this Agreement. When any such obligation is due and payable to us, we may pay such obligation, or any part thereof, from the Account without prior notice to you, and we will not be liable for the dishonor of any item or order which results from such exercise of our security interest. We can also setoff against your Account amounts which were credited into your Account that originated from an Account that became overdrawn or from an Account where we experienced a loss. If the Account has any POD beneficiary, the interests of such beneficiary shall be junior to our security interest and shall be subject to our right of setoff, even if we do not exercise our security interest or right of setoff until after your death.

**18. Overdrafts and Insufficient Funds; Payment Order of Transactions Being Presented.** An "overdraft" occurs when a check, ACH, ATM, debit card, bank fee (including any overdraft-related fee), or any other item or other debit (collectively, a "Transaction") is presented for payment against an Account and the available balance of the Account is insufficient to pay the Transaction. It is your responsibility to monitor and balance your Account, and you agree to not initiate or conduct transactions that will overdraw your Account and to assure that you have sufficient funds in your Account in advance to cover all Transactions charged against your Account. Any Transaction that may cause your Account to go into an overdraft status may be debited against the Account after the Account is in overdraft status and will be assessed a fee as set forth in the current fee schedule. If a Transaction is presented to the Bank and the Bank refuses to honor the Transaction because there are insufficient funds to pay the Transaction, your Account will be assessed a fee as set forth in the current fee schedule for returning the item unpaid. The Bank under no circumstances shall be required to monitor your Account for you, and you have the continuing responsibility to routinely balance your Account. When an overdraft occurs, subject to the special rules for consumer Accounts described below, the Bank may, at its sole and absolute discretion, refuse the Transaction, or alternatively, the Bank may choose to pay the Transaction, in which case a negative Account balance will result.

You agree that if your available balance is insufficient to pay any item presented against your Account you will promptly pay both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand. You further agree that you are liable for the amount of any overdraft, and you agree to pay the amount of any overdraft upon demand by us. Your failure to pay these amounts promptly may result in additional service charges to your Account which you agree to pay. We may use subsequent deposits and other credits to the Account, including, but not limited to, direct deposits of social security or other government benefits, to cover any overdraft and any charges existing in your Account. Additionally, we may use our right of setoff to collect any overdrawn balance from any other Account in which any of you have an ownership interest. In the event you fail to pay the amount of any overdraft and all associated service charges and we refer your overdrawn Account to an attorney for collection, you agree to pay all reasonable expenses, including without limitation, attorneys' fees and court costs. We may return any transaction being presented at any time if your available balance is insufficient to pay such transaction being presented, even if we previously have permitted overdrafts. You are not entitled to rely on any prior act by us with respect to your Account. Our election to pay overdrafts does not establish a course of dealing between you and us or modify the terms of this Agreement. You cannot rely on us to pay overdrafts on your Account regardless of how frequently or under what circumstances we have paid overdrafts on your Account in the past. We can change our practice of paying overdrafts on your Account without notice to you. You can ask us if we have other Account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another Account you have with us, but the Bank has no duty or obligation to provide same. For consumer Accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service.

***Payment Order of Transactions Being Presented.*** The order in which the transactions being presented are paid is important if there is not enough money in your Account to pay all of the transactions being presented. The payment order can affect the number of the

Sales & Service v3.14     567

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.          2023001821.1.2.3998-N20230125Y         12/2020
Page 18 of 26

transactions being presented against an overdrawn Account or returned unpaid and the amount of the fees you may have to pay. Please be aware of the fact that you control these issues, and you can avoid overdraft situations by always maintaining sufficient funds in your Account. To assist you in managing your Account, we are providing you with the following information regarding how we currently process those items. Deposits and credits to the Account are processed first. Any holds on those deposits, credits, or Account balances are then applied. After deposits and credits are credited to the Account and all holds applied, the transactions being presented are grouped in the following categories and then will generally be processed in the following order: (1) wire transfers, ATM withdrawals, cashed checks, checks and debits used in the purchase of official checks or similar non-recourse instruments or payments, and transactions initiated by the Bank (other than items drawn), from lowest amount to highest amount; (2) debit card transactions, from lowest amount to highest amount; (3) checks, ACH transactions, and other withdrawals from lowest amount to highest amount; and then (4) Bank fees, from lowest amount to highest amount.

If more than one item or order is presented for payment against the Account on the same day and the available balance of the Account is insufficient to pay them all, the Bank may pay any of them in any order the Bank chooses, even if the order the Bank chooses results in greater insufficient funds fees than if the Bank had chosen to pay them in some other order or had chosen not to pay them. The Bank's payment of any item or order in overdraft does not create any obligation for the Bank to pay any other item or order in overdraft in the future, and the customer agrees that no course of dealing regarding the payment of items or orders in overdraft will be created between the Bank and the customer. In the event the Account is overdrawn, the Bank reserves the right to change the categories and the processing order set forth above without notification to the customer. The Bank may also choose to first pay items and orders which are payable to the Bank.

**19. Signatures on Items; Facsimile Signatures.** It is your choice to decide whether or not to allow a machine or other device to sign your signature or allow others to sign your signature or to use an electronic signature. You agree that signatures provided by persons authorized to sign on your Account are valid, even if the principal-agent relationship is not indicated on the check or instruction. We will not reimburse you or any other person for items drawn in this fashion by any unauthorized person or by any person who exceeds his or her authority to do so, and we may honor all of these types of items presented to us. If you have opened your Account electronically or have signed or authenticated Account opening documents electronically, you agree that any written signature that you apply or cause or direct to be applied to any item drawn on your Account is an authorized signature and that we, in paying items drawn on your Account, may refer to and rely on such written signatures on authorized items previously drawn against your Account for signature verification purposes. By using a facsimile check stamping machine, by printing facsimile signatures, by using a facsimile stamp, or by allowing a facsimile signature or electronic signature to be used by any other means, you assume all risk of all possible losses. You acknowledge use of such devices is for your own convenience, and if checks are presented with such signatures, you may ultimately be responsible for any such losses. You hereby indemnify and hold us harmless from all losses resulting from our honoring an item in any instance in which the item bears or purports to bear a facsimile signature resembling a signature on file with us, regardless of by whom or by what means the actual or purported signature was affixed to the item.

**20. Indorsements.** To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g. additional indorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment. As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1 1/2" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. The automated processing of the large volume of checks we receive likely will prevent us from inspecting or looking for restrictive indorsements or other instructions on every check. The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement. For this reason, we are not

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023061821.1.2.3998-N20230125Y

562

12/2020
Page 19 of 28

required to honor any restrictive indorsement or other instructions placed on items you write or otherwise present for payment. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement or information you have printed on the back of the check obscures our indorsement. These indorsement guidelines apply to both personal and business checks.

**21. Abandoned, Inactive, or Dormant Accounts; Escheatment.** If you do not use your Account or notify us as required herein of your current contact information, or if statements or notices we send to you are returned undelivered, we may presume your Account and deposits are abandoned after the passage of time specified by applicable law. We may also consider your Account dormant or inactive in accordance with our internal policies and procedures or the applicable state law governing your Account. Unless prohibited by applicable law, abandoned and dormant Accounts are subject to reasonable service charges in addition to any other charges applicable to your Account, which we may deduct or offset from your Account. If your Account is deemed inactive or dormant under our policies and procedures or applicable state law, we also may refuse to pay items drawn on or payable out of the Account, stop sending Account statements (but such statements would still be made available to you), or stop paying interest on the Account. Ask us if you want further information about the period of time or type of inactivity that will cause your Account to be inactive, dormant, or otherwise abandoned as different states could have different rules. Accounts that are presumed abandoned may be escheated to the state in which the Account is maintained or in the state of the last known address, subject to applicable law. Once the funds are escheated to the state, we are no longer liable or responsible for the funds, and you must pursue recovery of such funds solely from the state to which they were escheated. You may or may not be able to get some or all of the funds back from the state to which they are surrendered, and you will likely have to pay additional fees or costs to get back such funds. You agree that the Bank is not liable to you for any funds that escheat to a state whether voluntarily or in response to an audit by or on behalf of state agency charged with enforcement of its escheatment laws.

**22. Transaction Instructions; Restrictions; Breaches of Your Security.** Unless required by law or in an instance where we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission, via a telephone call, leave by voice mail, send by text or instant message, send by email, or delivered by any other non-personal method of delivery, even if we have acted on instructions received by these means in the past. Any acceptance by us of instruction received through these means in the past does not establish a course of conduct or dealing and does not obligate us to accept them in the future. We are not responsible for the security of your internet, email, chat, or your other electronic communication systems (your communication systems). If a breach of one or more of your communication systems, whether physical or electronic, occurs or if unauthorized access to one or more of your communication systems or Accounts results in the issuance or alteration of transaction instructions that we receive (whether from you or a "hacker" or other unauthorized person who is manipulating one or more of your communication systems), you assume all risk of loss on such transactions, and you agree that we have no liability for any losses you sustain and you agree that you do not hold us responsible for such transactions. We may or may not ask you to implement additional security precautions as we deem sufficient.

**23. Stop Payments.** You may ask us to stop payment on individual checks, or on two or more checks with consecutive numbers, if the item or items have not already been paid. A stop-payment order must be received in time and with adequate information to give us a reasonable opportunity to act on it in the normal course of business. Additional limitations on our obligation to stop payment are provided by law. A stop-payment order must precisely identify the Account number, check number, date, and amount of the item, and the payee. The information must also be accurately reflected on the magnetic ink character recognition (MICR) line of the check. You agree that we cannot stop payment on the check if the information on the MICR line is incomplete or incorrect. You may request a stop-payment order in person by visiting one of our branches, a list of which can be found at **Cadencebank.com**. You may also request a stop-payment order by calling **1-888-797-7711**. If you attempt to issue a stop-payment order by telephone, we will confirm your stop-payment order in writing and the information in our confirmation will be presumed accurate and complete unless you notify us of an inaccuracy within fourteen (14) calendar days after we send you the confirmation notice. If you do not receive the confirmation notice in a timely manner, please let us know and request it again. Stop payments on checks are effective for 180 calendar days. You must place a new stop payment if you do not want us to pay the check after the previous stop-payment order expires. You will be charged a fee every time you request a stop payment, even if it is a renewal of a previous stop-payment request. You could also decide to close the Account. You understand that we may accept or cancel the stop-payment request from any of the owners or authorized signers of the Account regardless of who signed the check or authorized the transfer. Our acceptance of a stop-payment request does not constitute a representation by us that the item has not already been paid or that we have had a reasonable opportunity to act on the request.

If we have not already paid an ACH debit from your Account, then at your request and risk we may accept a stop-payment order on it. The stop-payment order takes effect within three (3) business days after we receive sufficient detail to place the stop-payment and have a reasonable opportunity to act on it in the normal course of business. If you issue a stop-payment order by telephone, we will confirm your stop-payment order in writing and the information in our confirmation will be presumed accurate and complete unless you notify us of an inaccuracy within fourteen (14) calendar days after we send you the confirmation notice. If you do not receive the confirmation notice in a timely manner, please let us know and request it again. Otherwise, your order is effective for 180 calendar days; provided, however, for recurring ACH debits on consumer Accounts, we keep a stop-payment order you place on recurring ACH debits in effect until the longer of either 180 calendar days or until we believe the merchant has stopped submitting the recurring ACH debit. To place a stop-payment order on an ACH debit, we may require you to provide your name and telephone number, the type of Account (checking or savings), the company name and company identification number used by the sender of the ACH debit. You can obtain the company name and company identification number used by your sender from your statement by looking at a prior ACH debit from this sender

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3998-N20230125Y

502

12/2020
Page 20 of 26

that posted to your Account. If you give us the wrong company identification number or if any other information you provide is not accurate, we may pay the transaction.

If the information you provide us for any stop payment is incorrect or incomplete (i.e. if the information is not sufficient for us to match the check or ACH debit on which you wish to stop payment) or if the item on which you place a stop-payment order does not contain magnetic-encoded check number, our computer system may not be able to match the check or ACH debit with the stop-payment request prior to such check or ACH debit posting to your Account. If we are subsequently able to identify the check or ACH debit as a match to your stop-payment request during our reconcilement process, despite the missing or incorrect information (each such matched check or ACH debit, a "Matched Stop Payment Item"), we may be able to try to then reverse the posting of the Matched Stop Payment Item and re-credit the funds to your Account on the next business day after it posted. During the interim between posting and re-credit, however, your available balance will be reduced by the amount of the check or ACH debit that was posted and you will not have access to such funds. You agree that we will not be liable to you for wrongful dishonor of any NSF item (i.e. any check, debit card transaction, ATM card transaction, ACH transfer, withdrawal or other debit item) that is not paid by us or is returned by us unpaid due to insufficient funds during the period of time between the posting and re-credit of the Matched Stop Payment Item, nor will we be liable for or obligated to waive any NSF or overdraft fee that may be charged to your Account as a result of our return or payment of such NSF item. We are not required to notify you when the stop-payment order expires, after which time any item we honor or pay will be deemed conclusively paid and you waive any claim to the contrary. If we refuse to pay an item pursuant to your stop-payment order, you release us and hold us harmless from all costs and expenses incurred by us, including our attorney's fees, resulting from our refusal to pay the item. If we re-credit your Account after paying an item over a valid stop-payment order, you agree to assign or otherwise transfer to us in writing all of your rights you have against the payee or other holder of the item. You further agree to assist us in any legal action we may take against such payee or holder. If we fail to honor a valid stop-payment order, we reserve the right to require you to demonstrate to our reasonable satisfaction the amount of your loss and we may only be liable to you for the lesser of the amount of the loss or the amount of the item. You do not have the right to stop payment on an official check, a cashier's check, a teller's check, a certified check, a money order or a traveler's check you have purchased from us, except as expressly stated below.

**24. Lost, Destroyed, or Stolen Certified, Cashier's, Official, or Teller's Checks.** Certified, cashier's, official, or teller's checks are instruments on which the Bank is or may be obligated to pay, so you generally do not have a right to stop payment on these instruments. However, under some circumstances you may be able to assert a claim for the amount of a lost, destroyed, or stolen certified, cashier's, official, or teller's check. To assert the claim: (a) you must be the remitter (or drawer of a certified check) or payee of the check; (b) we must receive notice from you describing the check with reasonable certainty and asking for payment of the amount of the check; (c) we must receive the notice in time for us to have a reasonable opportunity to act on it; (d) you must give us a declaration (in a form we require) of your loss with respect to the check; and (e) you agree to indemnify the Bank from future losses regarding the check. You can ask us for a declaration form. Even if all of these conditions are met, your claim may not be immediately enforceable. We may wait to pay the check until the ninetieth (90th) calendar day after the date of the check (or date of acceptance of a certified check). Therefore, your claim is not enforceable until the ninetieth (90th) calendar day after the date of the check or date of acceptance, and the conditions listed above have been met. If we have not already paid the check, on the day your claim is enforceable we become obligated to pay you the amount of the check. We will pay you in cash or issue another official check. At our option, we may pay you the amount of the check before your claim becomes enforceable. However, we will require you to agree to indemnify us for any losses we might suffer. This means that if the check is presented after we pay your claim, and we pay the check, you are responsible to cover our losses. We may also require you to provide a surety bond to assure that you can repay us if we suffer a loss.

**25. Backup Withholding/Taxpayer Identification Number and Certification.** Federal tax law requires us to report interest payments we make to you of $10 or more in a year, and to include your taxpayer identification number (TIN) on the report (the taxpayer identification number is your social security number if you are an individual). Interest includes dividends, interest and bonus payments for purposes of this rule. Therefore, we require you to provide us with your Taxpayer Identification Number and to certify that it is correct. In some circumstances, federal law requires us to withhold and pay to the IRS a percentage of the interest earned on funds in your Accounts. This is known as backup withholding. We will not withhold interest payments when you open your Account if you certify your Taxpayer Identification Number and certify to us that you are not subject to backup withholding due to underreporting of interest. There are special rules if you do not have a Taxpayer Identification Number but have applied for one, if you are a foreign person, or if you are exempt from the reporting requirements. We may subsequently be required to begin backup withholding if the IRS informs us that you supplied an incorrect Taxpayer Identification Number or that you underreported your interest income.

**26. Verification; Notice of Negative Information; Notification Requirement of Any Possible Inaccurate Credit Reporting.** You authorize us to request reports from various credit bureaus, consumer reporting agencies or other sources, including, but not limited to, credit and check reporting agencies, to investigate or verify any information provided to us or for any other purpose permitted by applicable law. You also authorize us to possibly obtain or otherwise verify your employment information. Additionally, we may require you to confirm information provided to us or to provide us with additional information we deem necessary to maintain your Account. You agree to respond to requests to confirm information provided to us or to provide us with additional information we request within thirty (30) calendar days of such request. If you fail to respond to our request for confirmation or for additional information, we may limit or suspend any access to your Account, refuse to permit any transactions on your Account, or take such other action we deem, in our sole and absolute discretion, appropriate or legally required. We will not be liable to you for any action we take pursuant to this section, including, but not limited to, any liability arising from wrongful dishonor of any item. Federal law requires us to provide the

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v2.14

2023091821.1.2.3998-N20220125Y

542

12/2020
Page 21 of 26

following notice to customers before any negative information may be furnished to a nationwide consumer reporting agency. Negative information includes information concerning delinquencies, overdrafts or any form of default. This notice does not mean that we will be reporting such information about you, only that we may report such information about customers that have not done what they are required to do under our Agreement. After providing this notice, additional information may be submitted to a nationwide consumer reporting agency without providing you another notice. We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you ever feel that the Bank has improperly reported potentially derogatory or inaccurate credit information about your Account, credit card or other relationship with the Bank, you will notify the Bank by calling **1-888-797-7711** or visiting one of the Bank's locations, a list of which can be found at **Cadencebank.com**. You also agree to contact the credit reporting agency and make a request to that agency to correct any possible improper credit reporting. We may require that you detail the alleged improper reporting in writing, and you will also provide backup information to show how and why you believe the reporting is inaccurate or improper. Depending on the credit reporting bureau or credit reporting service, you agree to follow administrative procedures in order to contest or amend any purportedly improper credit reporting as allowed by various credit reporting services before bringing any claims against the Bank. You also agree to provide a copy of your attempts to use the administrative procedures that allow you to change any purported improper credit reporting. Please understand that the Bank does not control any credit reporting service or credit reporting bureaus, and the Bank can only request (but cannot make or guaranty) changes to same. Before filing any type of lawsuit, consumer complaint or legal proceeding, you agree to request that the Bank and you file a joint letter requesting the requested change to the credit reporting.

**27. Changing Account Products.** We may, in our sole discretion, change your Account to another type of Account or product offered by us at any time by giving you notice that your Account will not be offered or will be changed to another product on a specified date. If you do not close your Account before the date specified in the notice, we may change your Account to that other product on the date specified in the notice. Your continued use of the new product, service or Account is your agreement to use said new product, service or Account and be bound by any new or changed terms, rules or agreements governing same.

**28. Legal Actions Affecting Your Account.** We may comply with any "legal process" such as, without limitation, a writ of attachment, execution, garnishment, levy, restraining order, subpoena, seizure, warrant, administrative order (including child support orders), or other legal process which we believe (correctly or otherwise) to be valid. Please understand that such legal process is the result of a third-party undertaking such actions, and the Bank may need to freeze your Account or take the requested action contained in the legal process documents sent to the Bank. We may place a hold on an Account or freeze some or all of the funds in an Account while we investigate the legal issues and take action we deem necessary to comply with same. It is your responsibility to obtain your own attorney to review and protect your rights and to take action to respond to the legal process to obtain the revocation or withdrawal of the legal process provided to the Bank. If we are not fully reimbursed for our record research, photocopying and handling costs by the party that served the legal process, we may charge such costs to your Account, in addition to our minimum legal process fee. You agree to reimburse us for any cost or expense, including attorney fees, which we incur in responding to legal process related to your Accounts. We may not pay interest on any funds we hold or set aside in response to legal process. You agree that we may honor legal process that is served upon the Bank regardless of the method of service or where your Account or records are maintained. If a bankruptcy or similar proceeding is filed by or against any Account owner, we may place an administrative hold on all or part of the Account balance in which that particular Account owner has an interest while we investigate and or pursue any legal action, we deem necessary in connection with the bankruptcy filing. Any legal process we receive is subject to our right of setoff and terms of any security interest we have in the Account. You acknowledge that Accounts opened with trust or fiduciary designations (e.g. XYZ, Inc. - Client Trust Account) may be subject to levies and other legal process against your property unless our records clearly reflect the existence of an express written trust or court order. If the Bank feels that it needs to take actions to freeze an Account, disburse money from an Account, or provide requested documents, it is your responsibility to obtain a court order to stop the Bank from taking the requested actions. Even if a court agrees with your position, the Bank can still undertake its own actions, including possibly interpleading or initiating a similar proceeding or requiring an agreement to be reached by all of the parties or claimants involved in the dispute. Notwithstanding any and all of the above, we may do any of these things without advance notice to you and even if the legal process involves less than all of the signers or owners of an Account. Additionally, legal process served on the Bank will likely cause the Bank to decide that there are conflicting demands or disputes to the funds in the Account, and the Bank can also undertake the other actions identified herein where the Bank is receiving conflicting demands regarding an Account. You agree that we will not be liable to you or to any other person for acting or not acting on any such legal process or for acting or not acting on the directions of any such representative or for placing or not placing temporary or permanent holds, and you indemnify us from and against any and all claims arising from or in any way relating to such action or inaction.

**29. Duty of Care.** You agree that no special relationship exists between you and the Company and that the Company owes you no fiduciary duty or heightened duty of care.

**30. Check Storage and Copies.** You agree that you will not receive your canceled checks. We may store images of your canceled checks or copies of them for a reasonable retention period. You may request copies of the images from us in the manner we require, and all copies you request are subject to research and copy fees.

**31. Check Cashing.** We may charge a fee for anyone that does not have an Account with us who is cashing a check, draft or other instrument written on your Account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may

Sales & Service v3.14                                                                56:

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.                                                          12/2020
                                       2023091521 1.2.3898-N20230125Y                      Page 22 of 24

include collecting a thumbprint or fingerprint. We reserve the right to refuse to cash a check, draft or other instrument drawn on us at one of our branches if: (a) we are suspicious about the transaction or the authority of the person presenting the check; (b) we have not received identification of the person cashing the check to our reasonable satisfaction; (c) our computers are not working at the time the check is presented; (d) it is made payable to a non-natural person as payee; (e) the amount of money exceeds any internal check cashing limit we may have at the branch where the check is presented or otherwise exceeds or materially reduces the cash on hand to operate the branch; or (f) for any other reason we deem reasonable under the circumstances. You agree that our refusal to pay cash on such an item does not constitute a wrongful dishonor. You agree to promptly pay the requesting party the amount in dispute, indemnify the Bank or otherwise handle the issues if demand is ever made upon us to pay the item.

**32. Truncation, Substitute Checks, and Other Check Images.** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid or is being processed for payment. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check Clearing for the 21st Century Act, as amended from time to time. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**33. Security.** It is your responsibility to protect the Account numbers, PIN codes, access codes, passwords, and access devices (e.g., checks, debit and ATM cards, mobile phones, tablets, computers, and security tokens) provide for or used in connection with your Account(s). Do not discuss, compare, or share information about your Account number(s) or credentials with anyone unless you are willing to give them full use of your money. An Account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish such information or access device to another person (for example, a family member, friend, bookkeeper or coworker, etc.) to conduct transactions, you are liable for transactions done by such person, regardless of whether the actions taken by such third party exceed the authority given. Your Account number can also be used to electronically remove money from your Account, and payment can be made from your Account even though you did not contact us directly and order the payment. You must also take precautions in safeguarding your Account information and access devices. Notify us at once if you believe your Account information or access devices have been compromised. You can contact the Bank by calling **1-888-797-7711** or visiting one of the Bank's locations, a list of which can be found at **Cadencebank.com**. As between you and us, if you are negligent in safeguarding your Account information or access devices, to the maximum extent allowable by applicable law, we may require you to bear the loss entirely yourself or at least share the loss with us. Except for consumer electronic funds transfers subject to Regulation E, or as otherwise prohibited by law, you agree that if we offer you services appropriate for your Account to help identify and limit fraud or other unauthorized transactions against your Account, such as positive pay or commercially reasonable security procedures, and you reject those services, or do not otherwise obtain said products or services you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence caused the loss. If we offered you a commercially reasonable security procedure which you reject, or do not otherwise obtain said products or services, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected.

**34. Remotely Created Checks Deposited with the Bank.** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not a check issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check may have a statement that the owner authorized the check or has the owner's name typed, stamped or printed on the signature line.

You warrant and agree that for every remotely created check we receive from you or persons acting on your behalf for deposit or collection:

   a.   you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check;

   b.   you will maintain proof of the authorization for at least 3 years from the date of deposit of such check, and supply us the proof if we ask; and

   c.   if a check is returned you owe us the amount of the check, regardless of when or why the check is returned.

We may offset funds from your Account to pay the amount you owe us, and if there are insufficient funds in your Account, you still owe us the remaining balance. The Bank may allow its customers to deposit remotely created checks as a convenience and may require a separate written agreement regarding such authorization. If the Bank faces a loss as a result of such remotely created checks, you assume any and all risk of loss for such transactions and agree to indemnify the Bank with regard to any loss the Bank may face or sustain (as well as attorney's fees and costs) as a result of such transactions. Additionally, the Bank may discontinue allowing these types of transactions at any time without notice. You agree to notify us in writing in advance if you intend to process remotely created checks.

**35. Monitoring and Recording Telephone Calls; Consent to Receive Electronic Communications.** You agree and are aware that we may monitor or record phone calls with you for security reasons, to maintain a record and to ensure that you receive courteous and

Sales & Service v3.14

582

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

2023091821.1.2.3998-N20230125Y

12/2020
Page 23 of 26

efficient service, and for various other reasons, you consent in advance to any such recording. We need not remind you of our recording before each phone conversation. You agree and are aware that the Bank and any of its current and former parent(s), subsidiaries, affiliates, employees, officers, directors, agents, controlling persons and representatives, as well as any other person or company who provides any services, and for various other reasons in connection with an Account (each a "Communicator") may monitor and record telephone calls regarding your Account to assure the quality of service or for various other reasons. You agree that any Communicator may call you, using an automatic telephone dialing system or otherwise, leave you a voice, prerecorded, or artificial voice message, or send you a text, e-mail, or other electronic message to service your Account, to collect any amounts you may owe under your Account or for other informational purposes related to your Account (each a "Communication"). You agree that any Communicator may call or text you at any telephone number that you provide in connection with your Account, including cellular telephone numbers, and may send an e-mail to any email address that you provide in connection with your Account. You also agree that any Communicator may inadvertently include your personal information in a Communication, and you agree to let us know in writing if this occurs to prevent such future Communications. You agree that the Bank will not charge you for a Communication, but your service provider may. In addition, you understand and agree that any Communicator may always communicate with you in any manner permissible by law that does not require your prior consent. If you wish to revoke your consent to be contacted at any cellular telephone number using an automatic telephone dialing system and/or an artificial or prerecorded message, you must notify the Bank in writing, and call the Bank at 1-888-797-7711, whereby you will identify your name, the Account(s) affected by your notice, and your cellular telephone number(s). You further agree that if you no longer own a cellular telephone number or if you change a residential telephone number to a cellular telephone number, you will notify the Bank immediately by calling the number above and provide written notice to the Bank.

When you give a telephone number directly to us or place a telephone call to us, you consent and authorize us to place calls to you at that number. You understand that a "telephone number" includes, but is not limited to, a cell phone or other wireless device number, and "calls" include, but are not limited to, telephone calls, pre-recorded or artificial voice message calls, text messages, and calls made by an automatic telephone dialing system from us or our affiliates and agents. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your Accounts. This express consent applies to each telephone number that you provide to us now or in the future and permits such calls regardless of their purpose. Calls and messages may incur charges from your communications provider. You may change or remove any of the telephone numbers or email addresses at any time by calling 1-888-797-7711 or visiting one of the Bank's locations, a list of which can be found at Cadencebank.com. You must also send the Bank a written notice to confirm said information.

**36. Subaccount Organization.** On checking Accounts, federal regulations allow the Bank to create transaction and savings sub-accounts which exist only on the books of the Bank and which allow the Bank to make transfers at the close of each working day. This puts the Bank in a more favorable position concerning reserve requirements and ultimately allows us to maintain the most competitive pricing on your checking Account. The activity of the sub-accounts will not be reflected on your bank statement and will not affect your Account balance or the interest, fees and features of your checking Account.

**37. Unlawful, Illegal, or High-Risk Transactions.** You agree that you will not use your Account for any transaction that is illegal in the jurisdiction where the Account is opened, the jurisdictions where you live, the jurisdiction where the transaction is consummated, or in any other jurisdiction affected by the transaction. You agree that it is your responsibility to determine the legality of each of your transactions in all applicable jurisdictions before entering into the transaction. You acknowledge and agree that we have no obligation to monitor, to review, or to evaluate the legality of transactions involving your Account. You also agree that you will not use your Account in connection with any Internet or online gambling transaction, or transactions involving cannabis products, whether or not gambling or cannabis are legal in any applicable jurisdiction. For example, you certify that you will not use your Account or do any banking transactions for any illegal purposes or activity including but not limited to those activities prohibited under the applicable federal or state law. You further represent and warrant that all transactions undertaken by you or on your behalf are legal and not in violation of any other laws. To the fullest extent permitted by law, you agree to pay for any item that you authorized, even if the transaction related to that term is determined to be illegal. We also reserve the right to refuse or return any item that we believe is related to an illegal transaction, an Internet or online gambling transaction, or a high-risk or otherwise illegal transaction, including, but not limited to, any transaction presented against your Account that we reasonably believe is related to the purchase, sale or exchange of any decentralized, non-fiat virtual currency, cryptocurrency, or any other digital currency or money that relies on distributed ledger or blockchain technology, and you agree that we shall have no liability to you whether we decline to pay or whether we pay any such item.

**38. Indemnification. In addition to the indemnification protections addressed elsewhere in this Agreement, if we take action in reliance on instructions or orders provided by you or anyone with authority to act on your behalf, or if we take any actions permitted under this Agreement, or if you breach any warranty or covenant provided in this Agreement or otherwise provided by law, and we incur any loss, damage, liability, cost or expense (including attorneys' fees and costs), resulting from any demand, action, suit, claim, or proceeding brought or made by any party, you hereby release us from any claims and indemnify and hold us harmless from and against any such liability, loss, damage, cost or expense.**

*Additional General Indemnification.* Except as otherwise set forth in this Agreement, you agree to indemnify, defend and hold us harmless from all claims, actions, proceedings, fines, costs and expenses (including without limitation, attorney fees and costs) related to or arising out of: (a) your actions and omissions in connection with your Accounts or our services; and (b) our actions

Sales & Service v3.14                                                                          562

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.                                                        12/2020
                              2023091821.1.2.3986-N20230126Y                                   Page 24 of 26

and omissions, provided that they are taken/omitted in accordance with this Agreement or your instructions. This provision shall survive the termination of this Agreement.

**39. LIMITATION OF LIABILITY AND WAIVER OF RIGHT TO PROCEED AGAINST US FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES. BY ENTERING INTO THIS AGREEMENT, TO THE MAXIMUM EXTENT ALLOWED BY LAW, YOU WAIVE THE RIGHT TO RECOVER, AND AGREE THAT WE SHALL NOT BE LIABLE FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES FOR ANY ACTION OR INACTION ON OUR PART REGARDING YOUR ACCOUNT OR YOUR BANKING RELATIONSHIP WITH US, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF YOU DO NOT AGREE TO THIS TERM, NOTHING PREVENTS YOU FROM CLOSING YOUR BANK ACCOUNT AND OR ENDING YOUR RELATIONSHIPS WITH US.** In other words, you expressly agree that damages in respect of any breach or wrongful conduct (whether or not the claim therefore is based on contract, tort, or other duty imposed by law), in connection with, arising out of, or in any way related to the transactions contemplated by this Agreement, or any Accounts, item, or instrument related to this Agreement, or any act or omission or event occurring in connection herewith or therewith shall be limited to your or our actual damages and shall not include any special, indirect, consequential, or punitive damages.

**40. Collection Costs.** You are liable for all amounts charged to your Account, including all amounts charged to your Account that cause an overdraft situation. Such amounts will include any amounts caused by debits to your Account, and or any other situations, including an offset (setoff), overdraft situation, lien or other fee or charge situation. If the Bank takes court action or initiates arbitration against you to collect such amounts or undertakes other demands, you will be liable for all costs, charges, and fees, including attorney's fees and costs. In the case of a joint Account, or an Account with more than one owner or authorized signer, each Account owner and authorized signer will be jointly and severally liable for all amounts charged to the Account regardless as to which owner actually caused the Account to be in an overdraft situation.

**41. ACH Transactions; International ACH Transactions.** From time to time, you may be a party to an ACH transaction that may be credited to or charged against your Account. You agree that you are bound by all applicable automated or other clearing house rules and regulations that apply to such transactions. Some transactions may be converted to ACH transactions by merchants with whom you conduct transactions. Merchants converting checks into ACH transactions at the point of sale should return the voided check to you, and you should dispose of it in a secure manner. Merchants receiving your check by mail should give you notice of the conversion to an ACH item and should destroy the check following conversion. If a merchant converts a check you write into an ACH transaction, then that item will be collected electronically and charged against your Account and that may happen more quickly than a typical transaction with a paper check. You should only write a check if you have sufficient funds in the account to immediately pay the check. For ACH transactions, you: (a) will not receive any copy of a cancelled check with your monthly statement; (b) your ability to place a stop payment will be limited or may be eliminated; and (c) your Account will need sufficient available funds to cover the debit. Whether your check is converted to an ACH item by the merchant at the point of sale or at the merchant's lockbox, a description of the transaction will appear on your periodic statement from us. Financial institutions are sometimes required by law to scrutinize or verify any international ACH transaction that they receive against the Specially Designated Nationals list of the Office of Foreign Assets Control. This action may, from time to time, cause us to temporarily suspend processing of an International ACH Transaction and potentially affect the settlement or availability of such payments.

**42. Wire and Other Funds Transfers.** We have rules and security procedures for initiating and receiving funds transfers, to the extent you originate or receive funds transfers on your Account that are not subject to the Electronic Fund Transfer Act or Regulation E. These rules and procedures may change from time to time and may require that you sign a Funds Transfer Agreement before we initiate certain funds transfers. In the event you do not execute a separate Funds Transfer Agreement, you agree to be bound by any rules and procedures then in effect governing the use of any system through which the funds may be transmitted including, but not limited to, Federal Reserve Board Regulation J with regard to FEDWIRE. You will receive confirmation of executed funds transfer payment orders in the periodic statements provided by us to you. Except for FEDWIRE funds transfers, any credit we give you is provisional (not final) until we receive final payment. If we do not receive final payment, you agree that we may reverse the credit to your Account or that you will otherwise reimburse us if funds in your Account are not sufficient. If a funds transfer is credited to your Account in error, you agree not to use the funds and agree to return the funds to the proper party. If there is ever any inconsistency or conflict between the account number and the name of a recipient on an instruction or payment order, we may rely exclusively on the account number and bank identification number contained in a payment order rather than the name. If you give us a payment order that is erroneous in any way, you agree to pay the amount of the order whether or not the error could have been detected by any security procedure we employ. We shall have no liability for failing to detect any error contained in any payment order sent by you to us. By using any of our funds transfer services, you acknowledge and agree that our methods and procedures for the authorization and authentication of funds transfers constitute commercially reasonable security procedures under applicable law. If you decide not to implement any reasonable security procedures recommended by the Bank or otherwise request to originate funds transfers without following the reasonable security procedures recommended by the Bank, you assume all risk of loss on such transactions. Additionally, if a funds transfer is originated fraudulently due to a breach or unauthorized access of your systems or the systems of a person with whom you communicate with which causes fraudulent instructions to be given to you or given to us by you or by the use of your systems or the systems of a person with whom you communicate, you assume all risk of loss on such transactions. For the improper delay or improper completion of funds transfer as a result of our error, our liability shall be limited to payment for loss of interest on the use of the funds. Interest shall be calculated on the basis of the average Federal Funds rate

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3008-N20230125Y

582

12/2020
Page 25 of 26

for the period involved. Any such compensation will be paid, in our option, by either a lump sum payment of cash, or a credit to your Account with us. Amendments to a payment order must be provided to us at least three (3) business days prior to our execution of the payment order. We may record any telephone conversations or data transmissions that initiate or amend payment orders.

**43. Force Majeure.** We are not liable to you or any other party for loss or damage to you by our failure to perform any obligations to you under the Agreement or applicable law if such failure arises out of or in any way relates to reasons beyond our reasonable control, including, but not limited to, natural disasters, acts of God, pandemics, war, civil unrest, terrorism, internet or telecommunications failures, system failures, computer failures, electrical outages, fire, flood, hurricane, earthquake or other catastrophe.

**44. Governing Law.** This Agreement is governed by the laws of the state in which your Account is established and by all applicable federal laws, rules, and regulations. We reserve all of our rights with respect to the preemptive effect of any applicable federal laws, rules, or regulations. All rights we have under the Agreement and applicable law are cumulative and not exclusive.

**45. Service Charges; Other Charges.** You acknowledge that you have been provided our current schedule of service charges and, if applicable, interest rates for your Account. You agree that all service charges and any interest rates applicable to the Account may be changed by us from time to time as set forth in this Agreement or other schedules. You agree that we may debit from your Account, even if your Account is dormant, abandoned, or unclaimed, without any further notice or demand, all service charges applicable to your Account, as well as charges for the purchase of checks, drafts, and other products or services ordered by you from or through us. You agree that if your Account is closed during a statement cycle, at the time the Account is closed, we may require payment of all service charges not yet posted to your Account for that statement cycle. We shall not be liable for failing to pay any item presented against your Account if the available balance is insufficient to pay the item because of debiting these service and other charges from your Account.

**46. Comparative Negligence Under the UCC.** If you timely report unauthorized exceptions or irregularities and if your failure to exercise ordinary care contributes to the forgery or alteration of an item, or the debit out of the account for a transaction or exception, which is paid against your Account, you will be precluded from asserting such forgery, alteration or other transaction (and any loss related to same) against us. If we assert such a preclusion, and you establish that our failure to exercise ordinary care on our part contributed to the loss resulting from the payment of the forged or altered item(s), the loss shall be allocated between you and the Bank on a comparative basis. In other words, your acts and omissions which contribute to the presentment and payment of any forged or altered item(s) or loss caused by the transaction(s) will be compared to the acts or omissions of the Bank to determine who should bear the loss or whether the loss should be allocated between you and the Bank. Notwithstanding this comparative negligence standard, the Bank will not be liable if items are forged or altered so that the forgery or alteration could not have been detected by a Bank exercising ordinary care.

**47. Employer's Responsibility for Fraudulent Indorsements or Transactions by Employees.** Many employers have employees that assist with banking activities. Such employees may or may not be authorized signers on Accounts. However, such employees may have "responsibility" as stated in §3.405 of the UCC. If you entrust an employee with responsibility with respect to an item or with regard to other banking activities, you understand and agree that you may be ultimately responsible for a loss if the employee conducts unauthorized transactions or otherwise has responsibility as defined in the UCC.

**48. Severability.** If any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable for any reason, in whole or in part, such holding shall not invalidate or render unenforceable any other provisions of this Agreement. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders unenforceable any provision hereof and to the extent that such waiver is not permitted by applicable law, the parties intend that such provision be interpreted as modified to the minimum extent necessary to render such provision enforceable.

Deposit Terms And Conditions
Wolters Kluwer Financial Services, Inc.

Sales & Service v3.14

2023091821.1.2.3998-N20230125Y

5/62

12/2020
Page 26 of 26